EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

IN RE:                                                    CASE NO. 25-31257

**DIOCESE OF ALEXANDRIA**

DEBTOR[1]                                               CHAPTER 11

___

### DECLARATION OF DAVID BROOK REGARDING THE NEED FOR
### CHAPTER 11 RELIEF AND IN SUPPORT OF FIRST DAY MOTIONS

I, David Brook, state under penalty of perjury that the following is true and correct:

1.      I am the Chief Financial Officer of the Diocese of Alexandria (the "Diocese" or the "Debtor"), a non-profit religious corporation incorporated under the laws of the State of Louisiana. I have served in this capacity since 1996.

2.      In my role as Chief Financial Officer, I am responsible for overseeing all financial operations of the Diocese, including budgeting, financial reporting, cash management, insurance procurement, payroll administration, and vendor relationships. I directly supervise the Diocese's accounting staff and work closely with department heads to ensure proper financial controls and reporting.

3.      I am familiar with the Diocese's day-to-day operations, including its cash management system, insurance programs, utility services, employee compensation and benefits, and relationships with vendors and service providers. I maintain regular contact with our financial institutions, insurance brokers, utility providers, and oversee payroll processes.

4.      I respectfully submit this Declaration based on my personal knowledge of the Diocese's financial and operational affairs; information learned from my review of relevant

___

[1] The Debtor's address is 4400 Coliseum Blvd, Alexandria, LA 71303. The last four digits of the Debtor's taxpayer identification number are 1102.

documents, including financial statements, insurance policies, payroll records, and utility bills; and information provided to me by members of my staff and the Diocese's advisory team. I am authorized to submit this Declaration on behalf of the Diocese, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.	I personally reviewed the factual exhibits attached to the Diocese's First Day Motions, including:

    **a.	From the Cash Management Motion:**

- While no separate exhibits were attached, I confirm that all bank accounts, banking relationships, and cash management practices described therein are accurate based on my regular review of the account statements, accounting records, and donor agreements, as well as my oversight and implementation of cash management procedures.

    **b.	From the Insurance Motion:**

- **Exhibit C** (Schedule of Insurance Coverage): The policy types, periods, and carriers listed are accurate based on our current coverage.

    **c.	From the Utilities Motion:**

- **Exhibit C** (List of Utility Companies): The utility providers, average monthly amounts, and account balances are accurate as of the Petition Date.

    **d.	From the Employee Motion:**

- While no separate exhibits were attached, I confirm that all employee counts, compensation amounts, and benefit costs stated in the motion are accurate based on our payroll records and benefits invoices, which I review monthly.

## PART I: PRELIMINARY STATEMENT

6.	I submit this Declaration in support of the Diocese's First Day Motions, which seek authority to maintain critical operations during the Chapter 11 reorganization. Specifically, I address (a) the Diocese's financial condition and the circumstances necessitating this Chapter 11 filing; and (b) the factual bases for the Diocese's requests to continue its critical cash management

2

system, its comprehensive Insurance Program, maintain uninterrupted utility services, and pay employee wages and benefits.

7.  The relief requested in these motions is essential to preserve the Diocese's ability to serve approximately 36,228 Catholics and countless others throughout its 11,108 square mile territory. Any disruption in the cash management system, insurance coverage, utility services, or employee compensation would immediately impair our ability to maintain churches, schools, and charitable services that are often the only resources available to vulnerable populations in rural Louisiana.

8.  Part II of this Declaration provides an overview of the Diocese's financial condition and the necessity for Chapter 11 relief. Part III describes the Diocese's existing cash management system. Part IV outlines the Diocese's insurance program. Part V addresses utility services, while Part VI discusses employee compensation and benefits. Part VII details the Diocese's immediate and ongoing operational needs. Finally, Part VIII explains the potential consequences of any operational disruption if the relief requested in the First Day Motions is not granted.

### PART II: THE DIOCESE'S FINANCIAL CONDITION AND NECESSITY OF CHAPTER 11 RELIEF

**A.    Overview of Financial Position.**

9.  As Chief Financial Officer, I oversee the Diocese's financial condition and am intimately familiar with our revenue sources, operating expenses, and cash flow challenges. The Diocese operates as a "Mission Diocese," meaning we are not financially self-sufficient and require external assistance to provide basic pastoral services to our 36,228 Catholics across our 11,108 square mile territory.

10.  For several consecutive years, the Diocese's operating expenses exceeded our gross operating revenue. Preliminary figures for the fiscal year ending June 30, 2025, reflect operating

3

revenue of approximately $10,167,465.91 and operating expenses of approximately $14,502,308.87, for a net operating loss of $4,334,842.96. This reflects acceleration in an already-troubling pattern of annual losses: $112,669 in FY 2023-2024, $307,886 in FY 2022-2023, and $317,865 in FY 2021-2022.

11.     Our primary revenue sources include diocesan collections, parish assessments, investment income, and limited grant funding. As a Mission Diocese, we receive assistance ranging from $125,000 to $160,000 annually for certain eligible activities, but this support is insufficient to address our structural deficit or the unprecedented legal costs we now face.

**B.      Impact of Clergy Sexual Abuse Litigation.**

12.     The Diocese's already precarious financial position is now severely exacerbated by litigation and claims related to decades-old clergy sexual abuse. These cases represent our most significant financial threat and the primary driver of our decision to seek Chapter 11 protection.

13.     Based on my analysis of litigation costs and consultation with our legal counsel, I project that the Diocese could incur approximately $400,000 in legal expenses for each lawsuit that advances through jury trial. This amount does not include the costs for any necessary appeals. With 37 pending cases, our legal defense costs could exceed $14.8 million, even before considering potential judgments or settlements.

14.     Indications from local plaintiffs' attorneys and the experiences of other dioceses suggest that additional persons may assert claims before the extended prescriptive period expires on June 14, 2027. Should the number of claims increase as anticipated, the Diocese's legal expenses alone could exceed $25 million, which would result in total financial collapse.

15.     An insurance archivist retained by the Diocese searched for historical liability insurance policies, but the policy periods identified to date do not encompass all dates of alleged

4

abuse. Even where coverage may exist, policy limits and potential coverage disputes create significant uncertainty regarding available insurance proceeds.

16. Without the protection of Chapter 11, adverse judgments in even a small number of the pending lawsuits could exhaust our available assets, forcing immediate cessation of operations and leaving later claimants without any possibility of compensation.

## C. Restricted Funds and Asset Limitations.

17. Of the Diocese's total assets, approximately 25% of the assets are restricted by donors for designated purposes and are not available to satisfy general creditor claims.

18. As Chief Financial Officer, I oversee the Diocese's compliance with donor restrictions and Louisiana's requirements for institutional funds. The Diocese maintains detailed procedures for tracking and managing donor-restricted funds separately from unrestricted assets. I personally review these procedures quarterly and work with our legal counsel to ensure compliance with Louisiana law, including the Uniform Prudent Management of Institutional Funds Act.

19. In my role, I maintain separate accounting records for all donor-restricted funds. These records document the specific purposes for which funds were donated, track expenditures to ensure compliance with donor intent, and provide regular reporting to our board oversight committee. The Diocese's restricted funds are held in separate investment accounts and bank accounts that I monitor monthly. Our board requires quarterly reporting on all restricted fund activity, and I personally certify compliance with donor restrictions as part of our annual audit process.

20. Our restricted assets fall into several categories that I monitor regularly: educational endowments designated for specific schools, charitable funds restricted to particular ministries,

building funds donated for specific construction projects, and other donations subject to donor-imposed limitations.

21.     The Diocese maintains separate accounting for restricted funds and uses such funds only in accordance with donor restrictions. Based on my review of the underlying donation agreements and our accounting records, these restrictions create legal obligations that limit the Diocese's ability to use these funds for general creditor claims. The Diocese acts as custodian of these donor-restricted funds, and as such, has no claim to the restricted funds pursuant to applicable Louisiana law.

22.     The substantial portion of our assets being restricted significantly limits our ability to address the mounting litigation costs and potential judgments described above. The distinction between restricted and unrestricted assets significantly affects the resources actually available for creditor distribution and any reorganization plan, making bankruptcy reorganization our only viable option to preserve both restricted and unrestricted assets for their intended purposes while ensuring equitable treatment of all creditors.

23.     I believe our consistent practices in maintaining donor restrictions demonstrates our commitment to honoring the legal obligations we accepted when receiving these donations. I am aware that Louisiana's Attorney General holds authority to enforce proper use of charitable assets, and the Diocese always maintained records that would demonstrate our compliance with donor intent. I consulted with legal counsel regarding the potential need to provide appropriate notice to Louisiana's Attorney General concerning our restricted funds, consistent with Louisiana statutory requirements for institutional funds.

24.     From my experience managing the Diocese's finances, maintaining donor confidence is crucial to our continued mission. Donors expect their restrictions to be honored

absolutely, and any failure to respect donor intent would severely damage our reputation and ability to attract future charitable contributions. This would create a devastating long-term financial impact that would undermine our capacity to serve the Catholic community, even after emerging from this Chapter 11 case.

25.     More broadly, 46% of the Diocese's total "assets" are functionally restricted. For example, to maintain the clergy insurance program, the Diocese assesses each church parish a priest insurance fee of $700 per month which is allocated to the Priest Retirement Fund ($375), the "Cadence" fund for medical coverage ($250), and the priest burial program ($75). These funds are collected for specific purposes, and the Diocese acts as a conduit. Using these funds for other purposes would violate the understanding with the parishes who paid them, the fiduciary duties to the priests who rely on these benefits, and potentially Canon Law obligations.

**D.      Necessity of Bankruptcy.**

26.     Prior to filing this Chapter 11 case, I worked with diocesan leadership to explore all available alternatives to bankruptcy. However, the magnitude of potential liability far exceeds our available resources. The Diocese's unrestricted assets are insufficient to satisfy potential judgments that could reach tens of millions of dollars based on settlements in other dioceses facing similar litigation.

27.     The Chapter 11 process provides the only viable mechanism to: (a) ensure equitable treatment of all abuse survivors; (b) maximize available resources for survivor compensation through an orderly reorganization; (c) preserve essential ministries and charitable works; and (d) provide certainty for our employees, parishes, and the communities we serve.

28.     Without Chapter 11 protection, the Diocese faces the very real prospect of piecemeal litigation that would likely result in early claimants receiving substantial recoveries

while later claimants receive nothing. This outcome serves neither the interests of justice nor the abuse survivors who deserve fair compensation for the harm they suffered.

<u>**PART III: THE DIOCESE'S EXISTING CASH MANAGEMENT SYSTEM**</u>

A.     **Cash Management System Overview.**

29.     In the ordinary course of its religious and charitable operations, the Diocese maintains a comprehensive cash management system (the "Cash Management System") that enables it to efficiently collect receipts, make disbursements, and manage cash flow for its various ministries and operations. The Cash Management System was developed over many years to comply with both civil law requirements and canonical obligations under the Code of Canon Law of the Roman Catholic Church.

B.     **Bank Accounts and Financial Institutions.**

30.     As of the Petition Date, the Diocese maintains approximately fourteen (14) bank accounts (collectively, the "Bank Accounts") at the following financial institutions (collectively, the "Banks"):

    a.  **Red River Bank**

        i.     Operating Account (Account No. ending in ****3391)

        ii.    Operating Account (Account No. ending in ****1641)

        iii.   Savings Account (Account No. ending in ****1666)

    b.  **Southern Heritage Bank**

        i.     Money Market Account (Account No. ending in ****2033)

        ii.    Certificate of Deposit (Account No. ending in ****0411)

        iii.   Certificate of Deposit (Account No. ending in ****0512)

        iv.    Checking (Account No. ending in ****1266)

8

c.  **Ameriprise Financial**

      i.  Investment Account (Account No. ending in ****1133)

C.  **Restricted and Special Purpose Accounts.**

31.    The Diocese maintains numerous restricted fund accounts that are segregated from general operating funds and held for specific charitable and religious purposes pursuant to donor restrictions, canonical requirements, and fiduciary obligations. These restricted accounts include:

    a.  **Priest Benefits Account – Cadence Bank**

      i.  Priest Benefits Account (Account No. ending in ****5769)

    b.  **Annual Diocesan Appeal Funds – Red River Bank**

      i.  Annual Diocesan Appeal Funds (Account No. ending in ****5126)

      ii.  Annual Diocesan Appeal Funds (Account No. ending in ****5167)

    c.  **Seminary Education Funds – Southern Heritage Bank**

      i.  Seminarian Education CD (Account No. ending in ****2098)

    d.  **Workers Compensation-Related Funds – Red River Bank**

      i.  Workers Compensation CD (Account No. ending in ****3527)

    e.  **Regions Bank**

      i.  Checking and Sweep Account (Account No. ending in ****9596)

32.    The Diocese maintains meticulous records demonstrating the restricted nature of these funds, including donor correspondence, grant agreements, trust instruments, and canonical decrees. These restricted funds are not commingled with the Diocese's general operating accounts and are maintained in separately identified accounts with distinct accounting treatment. Moreover, one of the Certificates of Deposit at Red River Bank secures the Debtor's obligations to the Louisiana Catholic Workers Compensation Pool, which is addressed below.

9

## PART IV: THE DIOCESE'S INSURANCE PROGRAM

**A.     Overview and Structure.**

33.     The Diocese maintains a comprehensive Insurance Program that provides essential coverage for both its own operations and numerous separately-incorporated Catholic institutions throughout north-central Louisiana. This centralized approach, which I helped develop and refine over the past 29 years, achieves significant economies of scale that would be unavailable if parishes and schools purchased coverage independently.

34.     The Insurance Program protects not only the Diocese's Centralized Activities—the Chancery, Bishop's residence, three parsonages, Maryhill Renewal Center, and LSU-Alexandria Catholic Student Center—but also fifty parishes, eight schools, and multiple charitable organizations that serve our communities daily.

35.     The total annual cost of the Insurance Program is approximately $2.945 million. The Diocese directly pays approximately $808,000 annually, of which approximately $484,000 is reimbursed by the apostolates, resulting in a net annual cost to the Diocese of approximately $325,000.

36.     The Insurance Program operates through two primary channels:

   a.   **Diocese-Procured**: Workers' compensation coverage through the Louisiana Catholic Workers' Compensation Pool ("LCWCP"); and

   b.   **Broker-Procured**: Property, liability, and automobile coverage through Waldorf Risk Solutions.

37.     The insurance coverage schedule attached as <u>Exhibit C</u> to the Insurance Motion accurately reflects current coverage types, policy effective dates and expiration dates, and insurance carrier information.

**B.     Workers' Compensation Coverage.**

10

38.     The Diocese participates in the LCWCP, a self-insurance pool created specifically for Louisiana's Catholic dioceses. This pool includes the Dioceses of Alexandria, Baton Rouge, Houma-Thibodaux, and Lake Charles. The pooled approach provides coverage that would be prohibitively expensive or unavailable in the commercial market for a small diocese like ours.

39.     The workers' compensation program operates through two layers of coverage:

    a.  **First Layer**: The LCWCP provides coverage for the vast majority of routine workplace injuries. As a requirement of membership in the pool, the Diocese maintains a $400,000 letter of credit from Red River Bank, secured by a certificate of deposit. In the unlikely event that the LCWCP exhausts its $1.5 million in coverage for the pooled claims (annual basis), excess coverage will be triggered; and

    b.  **Second Layer**: Safety National Casualty Corporation provides excess coverage up to $5 million, protecting against catastrophic losses that could otherwise devastate the pool.

40.     Our annual premium inclusive of the LCWCP and excess coverage is $494,344, which is billed quarterly and paid by the Diocese in monthly installments of $41,195.33. The Diocese's portion for its direct employees is $10,875 annually, with the remaining $483,469 reimbursed by the church parishes, schools, and other ministries within the territorial limits of the Diocese. The next installment is scheduled for payment at the beginning of November 2025.

**C.     Property and Liability Insurance.**

41.     Through Waldorf Risk Solutions, we maintain comprehensive property and liability coverage with Lloyd's of London as the primary carrier. This coverage protects:

    a.  historic church buildings, many dating to the 19th century;

    b.  school facilities educating 2,281 students;

    c.  administrative buildings and residential properties; and

    d.  general liability for religious, educational, and charitable activities.

42.     The annual property and liability premium is approximately $2,000,000. Under our new billing structure implemented this year, apostolates are billed directly for their portion (approximately $1,858,000), while the Diocese pays approximately $142,000 for its Centralized Activities.

43.     Coverage periods run from June 1, 2025 to May 31, 2026, with cyber coverage effective July 1, 2025.

44.     In my role overseeing insurance matters, I reviewed all deductible and self-insured retention provisions in our current policies. These obligations are structured as follows:

    a.  **Property Insurance Deductibles:**

        i.  All Other Perils: $25,000 per occurrence

        ii.  Flood: $25,000 per occurrence (except $250,000 for locations outside NFIP coverage)

        iii.  Earthquake: $50,000 per occurrence

        iv.  Windstorm/Hail: 3% of Total Insurable Values per building, subject to $100,000 minimum

        v.  Flood Zones A&V: $500,000 per occurrence

    b.  **Liability Insurance SIRs:**

        i.  $25,000 per occurrence/claim for most liability coverages

        ii.  $150,000 annual aggregate for all liability coverages combined

**D.     Automobile Insurance.**

45.     The automobile insurance component presented significant challenges during our summer 2025 renewal. Despite extensive efforts by our broker to obtain competitive quotes, the insurance market hardened dramatically. Our base premium increased from $237,687 to approximately $300,000, while coverage limits were cut in half.

12

46.     The majority of our automobile insurance exposure comes from St. Mary's Residential and Community Services, which operates a substantial fleet to transport over 200 residents with developmental disabilities to medical appointments, vocational training, and religious services. This transportation is essential to maintaining their dignity and quality of life.

47.     Faced with dangerously inadequate coverage limits, I recommended, and the Diocese approved, purchasing excess automobile liability coverage from Lloyd's of London at an annual premium of $150,000. While this increased our total automobile insurance cost to $451,258 annually, it restored appropriate protection levels.

48.     Recognizing that St. Mary's already operates on thin margins while providing critical services, the Diocese elected to pay the entire excess premium rather than pass this unexpected cost to the facility. The Diocese's total automobile insurance cost is approximately $172,000 annually, including the full excess premium, taxes, and fees.

49.     Below is an excerpt from the combined property, liability, and automobile insurance schedule prepared by our insurance broker, Waldorf Risk Solutions. I verified that this table reflects the amounts the Diocese paid for these coverages for policy year 2025-2026:

| Location | Total Amount Billed |
|---|---|
| Chancery | $222,275.67 |
| Bishop's Residence | $4,800.92 |
| LSUA Catholic Student Ctr. | $5,069.87 |
| Maryhill Renewal Center | $57,903.77 |
| Maryhill Youth Center | $23,758.57 |
| **TOTAL** | **$313,808.80** |

To the best of its knowledge and belief, the Diocese satisfied its property, liability, and automobile insurance premium obligations for policy year 2025-2026, and does not anticipate incurring additional premiums for these coverages in this policy year.

**E.     Brokerage Services.**

50. Waldorf Risk Solutions provides essential services beyond policy placement. Given the complexity of insuring religious institutions—with their unique combination of worship spaces, schools, and charitable operations—their specialized expertise is invaluable. They negotiate coverage enhancements, provide risk management guidance, coordinate certificates of insurance, and manage the complex billing arrangements for our numerous entities.

51. Without Waldorf's services, based on my experience and industry contacts, I estimate the Diocese would pay 40-60% higher premiums for inferior coverage, if coverage could be obtained at all for our smaller rural church parishes.

## PART V: UTILITY SERVICES

52. The Diocese requires continuous utility services to maintain its operations across multiple facilities. These services include electricity, landline telephones, cable, internet, and water services. I personally review and approve all utility bills monthly and maintain relationships with our primary providers.

53. The Diocese directly pays for utilities at its Centralized Activities: the Chancery, Bishop's residence, three parsonages, and Maryhill Renewal Center. Our primary utility providers include:

a. **Electricity**: City of Alexandria (municipal utility) and Cleco (Central Louisiana Electric Company)

b. **Gas**: City of Alexandria and Atmos Energy

c. **Water/Sewer**: City of Alexandria, City of Pineville, and Waterworks District No. 3

d. **Internet/Communications**: AT&T and Optimum

e. **Sanitation**: City of Alexandria

14

54.     I personally reviewed and verified the utility provider list attached as <u>Exhibit C</u> to the Utilities Motion. This list was compiled from our accounts payable vendor master files and recent utility bills and statements.

55.     As of the Petition Date, the Diocese is current with all Utility Companies, except for (a) unbilled utility services, (b) billed utility services for which payment is not yet due, or (c) written checks not yet cleared (collectively, the "Gap Period Obligations"). These Gap Period Obligations arise from normal billing cycles and payment processing times, not from any inability or unwillingness to pay. I personally confirmed this payment status through my review of the Diocese's accounts payable records, utility account statements, and check registers.

56.     For each utility provider listed in <u>Exhibit C</u>, I confirmed the accuracy of vendor names, average monthly payment amounts, account balances as of the Petition Date, and that all accounts are current except for normal billing cycle timing. The current balance amounts reflected in <u>Exhibit C</u> represent the Diocese's best information as of the Petition Date based on our accounting records and recent account statements. Some utility providers may not have provided updated invoices or account balance confirmations as of the date of this Declaration, but I verified our payment history demonstrates consistent, timely payments to all utility providers.

57.     Based on my review of the past twelve months of utility bills, our average monthly utility costs across all Centralized Activities total approximately $15,258, broken down as follows:

    a.   City of Alexandria (gas, electricity, sanitation, water, and sewer): $3,810.70

    b.   City of Pineville (sewer): $461.25

    c.   Optimum (cable, internet): $1,172.50

    d.   Waterworks District No. 3 (water): $643.29

    e.   AT&T (landline phones): $360.72

15

f. Atmos Energy (gas): $1,316.68

g. CLECO (electricity): $7,492.85

These amounts vary seasonally, with higher electricity costs during summer months due to air conditioning needs and higher gas costs during winter months for heating.

58.     Any interruption in utility services would result in immediate and severe consequences. Specifically, utility disconnection would:

a. prevent the Diocese from providing essential administrative support to the network of Catholic institutions serving thousands of Louisiana residents;

b. impair the Diocese's ability to communicate with parishes, schools, and charitable organizations across our 11,108 square mile territory;

c. create unsafe conditions at diocesan properties, including compromising climate control in historic buildings and disrupting security systems;

d. force immediate closure of Maryhill Renewal Center, eliminating its spiritual programs and retreats;

e. prevent payroll processing and maintenance of financial records at the Chancery;

f. eliminate critical communication infrastructure with our remote parishes; and

g. ultimately jeopardize the Diocese's reorganization efforts and harm creditor recoveries.

59.     Given our rural service area, many locations offer limited utility options. Disruption and subsequent reconnection could take weeks or months.

## PART VI: EMPLOYEE COMPENSATION AND BENEFITS

A.     **Workforce Overview.**

60.     I oversee payroll and benefits administration for all Diocese employees. Our workforce is essential to maintaining religious, educational, and charitable services across north-central Louisiana. The Diocese employs 27 Laypersons (23 full-time, 4 part-time) and 7 Diocesan Priests (including the Bishop). Additionally, the Diocese provides regular support payments for: one Independent Contractor providing mandated survivor assistance services ($11,493.09

16

monthly); six Parish Priests performing diocesan duties (reimbursements totaling $5,146.25 monthly); and eight Seminarians in formation ($50 monthly stipends each).

61.   Our total monthly compensation obligation is approximately $144,461.34, comprised of: Laypersons at $55,000 per biweekly pay period (approximately $110,000 monthly); Diocesan Priests at $17,422 monthly; Independent Contractor at $11,493.09 monthly; Parish Support (reimbursement for Parish Priests performing diocesan duties) at $5,146.25 monthly; and Seminarian Stipends at $400 monthly. I personally verified all these amounts by reviewing payroll registers, employee reports, benefits records, and payment schedules.

62.   Our payroll records confirm these compensation and benefit programs remained consistently maintained for years with only routine or cost-of-living adjustments. For example, the Diocese made semi-annual 403(b) contributions for the benefit of eligible employees for 34 years. The Diocese provided the monthly payments in compensation or other support for multiple years, and in some instances, for decades. These patterns represent our standard business practices and are consistent with practices throughout Catholic dioceses nationally.

**B.    Payroll Processing.**

63.   Laypersons are paid biweekly via direct deposit. I personally review and approve each payroll before processing. No individual Layperson receives more than $5,470 in salary or wages per pay period.

64.   Diocesan Priests and all monthly payments are processed on or about the 20th of each month. I maintain a monthly payment calendar to ensure timely processing of all compensation.

65.   As of the Petition Date, no pre-petition wages or salaries are outstanding.

**C.    Employee Benefits.**

17

66. The Diocese provides comprehensive benefits through the Christian Brothers Employee Benefits Trust, including health, vision, dental, prescription, disability, and life insurance. The Diocese pays 100% of employee premiums at a monthly cost of $42,222.90. These premiums are billed and due on the first of each month. Payments are made over the course of the month.

67. For retirement benefits, eligible Laypersons participate in the 403(b) Thrift Plan for the Employees of the Diocese of Alexandria. After three years of service, the Diocese contributes 1-5% of salary based on participation years. Our June 2025 contribution totaled $23,504.69, with a similar contribution expected in December 2025.

68. Laypersons accrue annual leave based on tenure, which is paid out upon separation. As of the Petition Date, I calculated our annual leave liability based on each employee's accrued hours and current pay rate. No individual employee earned more than $5,469.89 in accumulated leave pay during the 180 days before the Petition Date. Moreover, no individual employee receives more than $5,470 in salary or wages per pay period, and the Diocese is in ordinary arrears as of the Petition Date, such that the combination of unpaid wages and accrued annual leave for each employee is well below the $17,150 priority cap. Our sick leave accruals carry no cash value and are not paid out upon separation, consistent with our written policy.

**D.    Critical Personnel.**

69. Several positions are particularly critical to our operations:

a.    **Dr. Lee Kneipp, Victim Assistance Coordinator**: As an independent contractor, Dr. Kneipp provides mandated services under the USCCB Charter for the Protection of Children and Young People. His duties include supporting abuse survivors, conducting

18

psychological evaluations for clergy candidates, and providing expert testimony in tribunal proceedings. His specialized expertise would be extremely difficult to replace.

b. **Financial Staff**: Our accounting team of four employees maintains all financial records, processes accounts payable/receivable, and ensures compliance with nonprofit regulations. Any disruption would impair our ability to account for funds and maintain donor confidence.

c. **School Oversight Personnel**: one employee coordinates educational programs for the schools located in the Diocese's territorial limits. The employee's departure would jeopardize our ability to maintain academic standards and regulatory compliance.

E. **Employee Morale and Retention.**

70. The anticipation of the bankruptcy filing created significant anxiety among our workforce. Many employees approached me with concerns about job security and benefit continuation. Several key employees indicated they would be forced to seek other employment if paychecks or health insurance were interrupted, even briefly.

71. Given the modest compensation levels typical of religious organizations, our employees possess limited financial reserves. Any interruption in wages or benefits would cause immediate hardship and likely result in departures that would cripple our operations.

<u>**PART VII: IMMEDIATE OPERATIONAL NEEDS**</u>

72. Based on my review of our financial records and payment schedules, the Diocese faces the following immediate payment obligations:

a. **Cash Management**: Ongoing obligations to maintain accounts, banking relationships, and cash management practices to ensure operational needs are met and donor restrictions are observed.

b. **Insurance**: Workers' compensation monthly installment payment of $41,195.33 scheduled for the beginning of November 2025

19

c. **Payroll**: Next biweekly payroll of approximately $55,000 for Laypersons due November 18, 2025; monthly payments totaling approximately $34,461.34 due on/about November 20, 2025

d. **Utilities**: Ongoing monthly obligations of approximately $15,466.16 with various due dates

73. Without Court authorization, our banks may freeze accounts or refuse to process payments, causing immediate operational disruption.

## PART VIII: CONSEQUENCES OF OPERATIONAL DISRUPTION

74. Any interruption in cash management, insurance, utilities, or payroll would create cascading effects:

a. **Cash Management Interruption**: Would prevent the Diocese from paying its employees, funding its ministries, and maintaining its charitable services.

b. **Insurance Lapse**: Would violate our statutory obligations, potentially trigger default provisions in contracts, expose the Diocese to catastrophic losses during hurricane season, and constitute "cause" for case conversion or dismissal under Bankruptcy Code Section 1112(b)(4)(C).

c. **Utility Disconnection**: Would force immediate closure of facilities, prevent payroll processing and financial reporting, eliminate communication with remote parishes, and potentially cause permanent damage to historic properties.

d. **Payroll Interruption**: Would likely trigger immediate resignations of key personnel, violate our moral obligations to employees who already performed services, eliminate health insurance coverage for employees and families, and severely damage our ability to recruit replacement staff.

75.     The integrated nature of our operations means that failure in any one area would compromise the others. For example, utility disconnection would prevent payroll processing, while loss of key financial staff would impair our ability to maintain insurance and pay utilities.

76.     Most critically, these operational disruptions would immediately impact the vulnerable populations we serve. Manna House could not refrigerate food, schools might be forced to close, and charitable programs would cease operations. For many in our rural service area, these Catholic institutions are essential resources.

## PART IX: CONCLUSION

77.     Throughout my 29 years as CFO, I worked diligently to maintain the Diocese's operations despite ongoing financial challenges. The Cash Management System, Insurance Program, utility services, and employee compensation structures described herein represent the absolute minimum necessary to fulfill our religious and charitable mission. Any disruption in cash management, insurance, utilities, or payroll would cascade through our entire network of churches, schools, and charitable organizations, ultimately harming the very communities we exist to serve. The amounts involved—approximately $325,000 annually for insurance, $15,258 monthly for utilities, and $144,461.34 monthly for personnel—are modest relative to the scope of our operations and the critical services we provide to over 36,000 Catholics and countless others throughout north-central Louisiana.

78.     I personally reviewed all factual exhibits attached to the First Day Motions and confirm their accuracy based on my review of source documents and records maintained in the ordinary course of the Diocese's business.

79.     I respectfully urge the Court to grant the relief requested to ensure uninterrupted service to the 36,228 Catholics and countless others who depend on the Diocese's ministries, schools, and charitable programs.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: October 31, 2025

*/s/ David Brook*
**DAVID BROOK**
**Chief Financial Officer**
**Diocese of Alexandria**