# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

IN RE:                                            **CASE NO. 25-31257**

      **DIOCESE OF ALEXANDRIA**

      **DEBTOR[1]**                                        **CHAPTER 11**

---

### DECLARATION OF JOHN D. BAUMGARTNER IN SUPPORT OF DEBTOR'S REPLY TO U.S. TRUSTEE'S OBJECTION TO DEBTOR'S REQUEST TO WAIVE DEPOSITORY REQUIREMENTS OF § 345(b)

I, John D. Baumgartner, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## I. QUALIFICATIONS AND BACKGROUND

1.      My name is John D. Baumgartner. I am over the age of eighteen (18) and competent to make this Declaration. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2.      I serve as a managing director of Getzler Henrich & Associates LLC ("Getzler Henrich"), a middle-market corporate turnaround and restructuring firm that provides strategic financial services in large-scale corporate restructuring transactions. I have over 20 years of consulting, restructuring, and corporate finance experience.

3.      Throughout my career, I have been involved with financial and operational restructurings, viability analyses, solvency analyses, valuation of assets and enterprises, asset divestitures, and due diligence engagements. I have advised debtors, senior lenders, mezzanine lenders, trustees, and unsecured creditors of companies in industries that include oil and gas,

---

[1] The Debtor's address is 4400 Coliseum Blvd, Alexandria, LA 71303. The last four digits of the Debtor's taxpayer identification number are 1102.

1

healthcare, energy services, power and utilities, retail gas marketing, retail power marketing, midstream energy companies, real estate, web hosting/e-commerce, transportation, and retail services.

4.      I also serve as a consulting expert and testifying expert, primarily on litigation related to insolvencies. My expert testimony has addressed issues including solvency analysis, valuation, fraudulent transfer analysis, and financial condition assessments in bankruptcy and commercial litigation matters.

5.      Previously, I worked for international accounting firms, a national consulting firm, and boutique investment banking firms, where I gained extensive experience in corporate restructuring, financial analysis, and distressed situations across diverse industries.

6.      I earned my M.B.A. from the Jones Graduate School of Business at Rice University and a B.A. in Economics from Rhodes College. My education and professional experience have provided me with comprehensive expertise in financial analysis, corporate finance, bankruptcy proceedings, and the evaluation of banking relationships and deposit risks.

7.      I hold the designation of Certified Insolvency & Restructuring Advisor (CIRA) and hold a Certification in Distressed Business Valuation (CDBV). Both credentials are awarded by the Association of Insolvency & Restructuring Advisors (AIRA), a leading professional organization in the field of insolvency analysis, corporate turnarounds, and restructuring. These designations signify a high level of expertise and a commitment to professional standards in the insolvency and restructuring industry.

8.      The Certified Insolvency & Restructuring Advisor (CIRA) designation is granted to professionals who have demonstrated significant experience and knowledge in the areas of bankruptcy, corporate turnaround, and restructuring. To obtain the CIRA, a candidate must possess

2

a minimum of five years of relevant accounting or finance experience, with at least 4,000 hours in specialized insolvency and restructuring work. The process also includes passing a comprehensive three-part examination that covers topics such as managing turnaround and bankruptcy engagements, developing reorganization plans, and financial reporting and ethics. The Certification in Distressed Business Valuation (CDBV) is a specialized credential that attests to a professional's expertise in valuing businesses and assets in distressed situations. The CDBV program involves a rigorous course of study and a written examination, focusing on the unique valuation challenges presented by financially troubled companies. Candidates for the CDBV are required to have a strong background in areas such as public accounting, investment banking, or crisis management, ensuring that they possess the practical experience necessary to handle complex valuation assignments in the context of insolvency and bankruptcy.

9. I have been previously qualified as an expert before the United States Bankruptcy Court for the Western District of Louisiana in the case of *In re: Acadiana Management Group, LLC,* 17-50799, before the United States Bankruptcy Court for the Eastern District of Louisiana in the case of *In re: Flambeaux Gas & Electric Lights, L.L.C*, 18-11979, and in numerous other bankruptcy courts across the United States.

10. I have been retained by the Diocese of Alexandria (the "Diocese" or "Debtor") to provide analysis and consultation regarding its banking relationships and the appropriateness of seeking a waiver under 11 U.S.C. § 345(b). Getzler Henrich was initially engaged by counsel for the Debtor on or around August 16, 2024, to provide financial advisory services relating to the Debtor, and thereafter entered into an engagement letter to continue providing financial advisory and management consulting services during the Debtor's Chapter 11 case.

25-80055-#14381 File 12/02/25 Entered 12/02/25 10:30:45 Main Doc Declaration Pg 3 of 24
Baumgartner Pg 3 of 24

11.     In connection with this engagement, I have reviewed: (a) the Diocese's banking relationships and account structures; (b) the financial condition and capitalization of the Diocese's depository institutions; (c) the security arrangements and protections currently in place; (d) the U.S. Trustee's Objection to the Debtor's Request to Waive Depository Requirements of § 345(b) (ECF No. 124); (e) the Debtor's Reply to that Objection; (f) the Addendum to Schedule A/B regarding the Ameriprise Financial Investment Account (ECF No. 126); (g) various financial statements, account agreements, and related documentation; and (h) publicly available financial data and regulatory filings concerning the Diocese's depository institutions, including FDIC records regarding historical bank failures.

12.     The financial data, regulatory filings, and independent rating services I have reviewed and relied upon in this Declaration—including FDIC regulatory data, Weiss Ratings, BauerFinancial ratings, bank financial statements, and publicly available Call Report data—are of the type reasonably relied upon by experts in the fields of corporate restructuring, insolvency analysis, and banking risk assessment. The analytical methodologies I have employed in this Declaration, including capital ratio analysis, asset quality assessment, profitability metrics evaluation, historical recovery rate analysis, and net exposure calculations, are generally accepted methodologies in the restructuring and financial advisory profession and are consistent with standards employed by certified insolvency and restructuring professionals.

## II. ANALYSIS OF SOUTHERN HERITAGE BANK ACCOUNTS

13.     The U.S. Trustee's calculation that approximately $7.3 million in Diocese funds at Southern Heritage Bank are "uninsured" and therefore at risk fundamentally mischaracterizes the actual risk profile of these deposits.

4

14.     **The Secured Certificate of Deposit.** Southern Heritage Bank account ending in 0512 contains a certificate of deposit with a balance of $2,614,012.73 that serves as collateral for the Diocese's secured loan obligation of $1,650,000.00. There is a perfected security interest in this asset in favor of Southern Heritage Bank as disclosed in the Diocese's Schedule D.

15.     In the event of a Southern Heritage Bank failure, the bank (or its receiver/successor) would have a first-priority claim to the pledged CD to satisfy the loan obligation. From a net economic exposure standpoint, the Diocese's potential loss in such a scenario would be limited to:

    a.  The surplus after loan satisfaction: approximately $964,012.73 ($2,614,012.73 - $1,650,000.00)

    b.  Less FDIC insurance: $250,000.00

    c.  **Net exposure: approximately $714,012.73**

16.     When properly calculating the estate's net exposure to uninsured deposits, the $1,650,000.00 secured loan obligation must be offset against the pledged CD balance. The Diocese owes this $1,650,000.00 regardless of whether Southern Heritage Bank fails or remains solvent. If the bank fails, the loan would be satisfied from the pledged CD through the receiver's exercise of the security interest—which is precisely what the pledge arrangement contemplates. From the estate's perspective, this represents offsetting positions: a deposit asset of $2,614,012.73 against a corresponding loan liability of $1,650,000.00. The funds securing the loan are not "at risk" in the sense of representing potential loss to creditors because they offset an equal liability. Therefore, when assessing actual risk exposure to the estate and its creditors, the economically meaningful figure is the net amount: approximately $714,012.73 (the surplus after loan satisfaction and FDIC insurance).

17.     **Corrected Net Exposure Calculation.** When properly analyzed, the unprotected funds at Southern Heritage Bank total approximately $5.64 million ($7,544,381.62 total deposits

- $250,000 FDIC - $1,650,000 secured by pledged CD = $5,644,381.62), not the $7.3 million suggested by the U.S. Trustee. This represents a 23% reduction in stated risk.

18.     Moreover, and crucially, this $5.64 million figure itself overstates the actual risk because it:

     a.   Assumes zero recovery in the liquidation of a well-capitalized institution;

     b.   Ignores available FDIC insurance expansion through IntraFi Network Deposits products; and

     c.   Treats donor-restricted funds as unrestricted estate assets.

## III. FINANCIAL STRENGTH OF SOUTHERN HERITAGE BANK

19.     I have analyzed Southern Heritage Bank's financial condition based on publicly available regulatory filings, independent rating agencies, and financial metrics. The bank demonstrates exceptional financial strength that substantially mitigates any risk of failure.

20.     **Capital Ratios.** Southern Heritage Bank maintains a tier 1 capital leverage ratio of 10.39% as of its most recent regulatory filing. This ratio is in line with the community bank industry average of 10.52%. Under 12 C.F.R. § 324.403(b)(1)(i)(C), banks must maintain a minimum leverage ratio of 3% to be considered adequately capitalized. Southern Heritage Bank's 10.39% ratio exceeds this threshold by more than three times, indicating substantial capital cushion and financial resilience.

21.     Weiss Ratings, an independent bank rating service, rated Southern Heritage Bank's capitalization as "excellent," scoring 9.1 out of 10, and assigned a "fair" overall stability index to the bank. Weiss Ratings has been providing independent assessments of financial institutions for over 50 years.

22.     **Asset Quality.** Southern Heritage Bank's non-performing assets represent approximately 1.0% of total assets. While this is slightly above the industry average of 0.66%, it

6

remains at a manageable level and is offset by the bank's strong capital position. More significantly, actual loan charge-offs have been minimal, with annual net charge-offs at only 0.22% of loans, which is well below the industry average of 0.7%. This indicates that the bank's underwriting practices are sound and that problem loans are being properly identified and reserved for.

23. **Profitability Metrics.** Southern Heritage Bank demonstrates strong and sustainable profitability:

    a. **Return on Assets (ROA): 1.84%** - significantly exceeding the community bank industry average of 1.11%

    b. **Return on Equity (ROE): 20.5%** - substantially above the banking industry average of 12.43%

24. These profitability metrics indicate sound management, operational efficiency, and the ability to generate earnings that support capital growth and absorb potential losses.

25. **Independent Rating Confirmation.** BauerFinancial, another respected independent bank rating service, awarded Southern Heritage Bank a 5-Star "Superior" rating—their highest grade. BauerFinancial has been analyzing and rating U.S. banks and credit unions since 1983.

26. **Historical Context - Louisiana Bank Failures.** According to FDIC records, bank failures in Louisiana are extremely rare. There have been only four bank failures in Louisiana over the past 25 years:

    a. Farmer's Bank of Cheneyville (FDIC Cert #16445) - Closed December 17, 2002, acquired by Sabine State Bank & Trust - approximately 60% recovery for uninsured depositors

    b. Central Progressive Bank (FDIC Cert #19657) - Closed November 18, 2011, acquired by First NBC Bank

c.  First NBC Bank (FDIC Cert #58302) - Closed April 28, 2017, acquired by Whitney Bank (now Hancock Whitney Bank) - approximately 72% recovery for non-transactional depositors, with transactional accounts fully assumed by the acquiring bank

d.  Statewide Bank (FDIC Cert #29561) - Closed March 12, 2010, acquired by Home Bank

27.     Notably, two of these four failures involved the same institution: First NBC Bank acquired the assets of Central Progressive Bank in 2011, and then First NBC Bank itself failed in 2017 and was acquired by Whitney Bank. This sequence demonstrates that even when a bank fails, the FDIC's resolution process successfully protects depositors through acquisition by stronger institutions, and that acquiring banks in such situations are typically sufficiently strong to assume all obligations.

28.     This historical pattern in Louisiana demonstrates that the FDIC's bank resolution process effectively protects depositors through acquisition by healthy institutions, with recovery rates for uninsured depositors ranging from 60% to full recovery.

29.     **Nationwide Bank Failure Context.** Nationwide, there have been only thirteen bank failures since 2020. In the vast majority of these failures, uninsured depositors received substantial or complete recovery through either: (a) acquisition by a healthy institution that assumes all deposits (nine out of thirteen cases), or (b) substantial liquidation dividends. In three cases, the FDIC made all depositors whole through the systemic risk exception.

30.     Under 12 U.S.C. § 1821(d)(11), depositors have priority over general unsecured creditors in bank receiverships, providing an additional layer of protection even in the unlikely event of a bank failure without acquisition.

31.     **Risk Assessment Conclusion.** Based on Southern Heritage Bank's strong capital position (10.39% leverage ratio), excellent capitalization rating (9.1/10 from Weiss), superior

8

overall rating (5-Star from BauerFinancial), strong profitability (1.84% ROA, 20.5% ROE), and low actual charge-offs (0.22%), the probability of Southern Heritage Bank failing is exceptionally low. The probability of a failure resulting in material losses to uninsured depositors is lower still, given Louisiana's historical recovery rates (ranging from 60% to full recovery) and the consistent pattern of failed banks being acquired by healthy institutions. Southern Heritage Bank's strong financial condition would make it an attractive acquisition target in the unlikely event of distress.

32.    Per the bank's latest report to the Federal Deposit Insurance Corporation, as of September 30, Southern Heritage Bank's assets are diversified across US Treasury and Agency securities, other state and local government bonds, loans against real estate (including development projects, multi-family housing, 1-4 family residential properties, commercial / industrial properties, among others), some personal loans, as well as other assets. An increase in interest rates would negatively affect the value of the bond portfolio, but approximately half of the bonds mature within three years, limiting the impact on prices of a rise in interest rates. Without access to the components of the bond portfolio, it is difficult to calculate precisely, but in rough numbers if I make the conservative assumption that all the securities have fixed coupons, a 100 basis point increase in yields could reduce the market price of the bond portfolio by 2-4%, or $2 million to $4 million.

33.    The largest single asset at Southern Heritage Bank, the CD pledged as collateral for the loan from the bank, matures within 5 months. In my opinion, the likelihood of a 100 basis point increase in interest rates within the next five months is very low.

## IV. RESTRICTED FUND PROTECTIONS

34.    The Diocese maintains the Seminarian Education Fund certificate of deposit (account 2098, balance $2,803,905.00) subject to express donor restrictions. Under Louisiana's

Uniform Prudent Management of Institutional Funds Act (UPMIFA), La. R.S. 9:2337.1 et seq., these restrictions create enforceable legal obligations that separate these funds from the Diocese's general assets.

35.     If required by the Court, this CD could receive additional FDIC protection through IntraFi's CDARS (Certificate of Deposit Account Registry Service) product, which provides FDIC insurance coverage beyond $250,000 by distributing funds across multiple participating banks while maintaining the funds in a single certificate of deposit from the depositor's perspective.

36.     Similarly, the unrestricted demand deposit and money market accounts (accounts 1266 and 2033) could utilize IntraFi Network Deposits product ICS to obtain full FDIC insurance coverage. Southern Heritage Bank is capable of providing these services.

## V. ANALYSIS OF AMERIPRISE FINANCIAL ACCOUNT

37.     I have carefully reviewed the Ameriprise Financial Investment Account (ending in ****1133) and the detailed Addendum to Schedule A/B filed by Chief Financial Officer David Brook under penalty of perjury on December 3, 2025 (ECF No. 126). As detailed in the Schedule A/B Addendum, the account, with a total value of $1,514,084.35 as of the Petition Date, is comprehensively protected.

38.     **FDIC-Insured Certificates of Deposit.** The account holds three certificates of deposit totaling $675,773.00, each carrying FDIC insurance running in favor of the Diocese of Alexandria:

   a.   Morgan Stanley Private Bank NA (FDIC #34221): $250,040.00 (FDIC insured to $250,000)

   b.   Wells Fargo Bank NA (FDIC #03511): $225,261.00 (FDIC insured to $250,000)

   c.   Coastal Carolina National Bank (FDIC #58864): $200,472.00 (FDIC insured to $250,000)

39.     Each certificate is separately insured by the FDIC up to applicable insurance limits. These certificates are not subject to § 345(b) risk—they receive full FDIC protection by virtue of their structure as direct deposits at separate FDIC-insured institutions.

40.     **FDIC Pass-Through Coverage for Cash Equivalents.** The account includes $288,311.35 in the Ameriprise Insured Money Market Account (AIMMA), held in omnibus accounts at:

    a.   Ameriprise Bank FSB, Minneapolis, Minnesota: $246,264.55

    b.   Goldman Sachs Bank USA, Salt Lake City, Utah: $42,046.80

41.     These deposits receive FDIC pass-through insurance coverage in favor of the Diocese as the beneficial owner, up to applicable FDIC limits. The $246,264.55 at Ameriprise Bank FSB is fully insured (under the $250,000 limit), and the $42,046.80 at Goldman Sachs Bank USA is fully insured (under the $250,000 limit), providing full FDIC protection for the entire $288,311.35.

42.     **Permitted Mutual Fund.** The account holds 550,000.000 shares, valued at $550,000.00, of Goldman Sachs Financial Square Federal Instruments Admin Class (Symbol: FIOXX). While this mutual fund is not FDIC insured, in my opinion it meets the financial requirements of 11 U.S.C. § 345(b)(2) because it invests solely in obligations of the United States. The FIOXX mutual fund invests exclusively in U.S. Treasury Securities (direct obligations issued by the U.S. Treasury Department) and Government Agency Obligations, which are securities issued by U.S. government agencies, including Federal Home Loan Banks (FHLB), Federal National Mortgage Association (Fannie Mae), and Federal Home Loan Mortgage Corporation (Freddie Mac).

43.     **Total Protection.** Of the $1,514,084.35 total value of the Ameriprise account:

11

a. $964,084.35 (64%) receives full FDIC insurance protection ($675,773.00 in CDs + $288,311.35 in money market)

b. $550,000.00 (36%) is invested in government securities expressly permitted by § 345(b)(2)

c. **100% of the account complies with the protective purposes of § 345(b)**

44.    The Ameriprise account presents no § 345(b) compliance issue whatsoever, and the comprehensive protections in place justify a waiver for this account.

## VI. RISKS OF FORCED ACCOUNT RESTRUCTURING

45.    **The Pledged CD Cannot Practically Be Moved.** The certificate of deposit securing the Southern Heritage Bank loan is pledged collateral subject to a perfected security interest. Moving these funds would require either: (a) paying off the $1,650,000 loan in full, necessitating liquidation of other assets and creating liquidity strain during critical bankruptcy stages, or (b) obtaining Southern Heritage Bank's consent to release the collateral, which the bank has no obligation to provide. Neither option is practical or beneficial to the estate, and forcing this restructuring would likely result in loss of the secured credit facility on favorable terms.

46.    **Early Withdrawal Penalties - Specific Calculation.** The Diocese holds two significant certificates of deposit at Southern Heritage Bank that would be subject to early withdrawal penalties:

| Account | Balance | Purpose |
|---|---|---|
| CD 0512 | $2,614,012.73 | Pledged as collateral for $1,650,000 secured loan |
| CD 2098 | $2,803,905.00 | Seminarian Education Fund (donor-restricted) |
| Total | $5,417,917.73 | |

47.    Standard industry practice for early withdrawal penalties on certificates of deposit is as follows:

12

a. **90 days of interest (3 months)** for short-term CDs (original terms of 12-18 months)

b. **180 to 360 days of interest (6-12 months)** for longer-term CDs (original terms exceeding 18 months)

48.     Without access to the actual certificate agreements showing the specific terms and maturity dates, I have calculated potential early withdrawal penalties based on standard market practices and current community bank CD rates.

49.     Assuming these are short-term CDs subject to the standard 90-day interest penalty, and applying current community bank CD rates ranging from 3.5% to 5.0% APY, the early withdrawal penalties would be calculated as follows:

| Interest Rate | CD 0512 Penalty | CD 2098 Penalty | Total Penalty |
| :---: | :---: | :---: | :---: |
| 3.5% APY | $22,559 | $24,198 | $46,757 |
| 4.25% APY | $27,393 | $29,384 | $56,777 |
| 5.0% APY | $32,228 | $34,569 | $66,796 |

50.     Based on this analysis and my review of current market conditions, I conclude that the early withdrawal penalties for these two CDs alone would range from approximately **$47,000 to $68,000** if a 90-day interest penalty is applied, which is the standard penalty structure for short-term certificates of deposit.

51.     **However, if either or both of these certificates has a longer maturity requiring a 180-day interest penalty, the costs would be substantially higher.** Applying the same interest rate ranges to a 180-day penalty period would result in the following:

| Interest Rate | CD 0512 Penalty (180 days) | CD 2098 Penalty (180 days) | Total Penalty |
| :---: | :---: | :---: | :---: |
| 3.5% APY | $45,118 | $48,396 | $93,514 |

13

| Interest Rate | CD 0512 Penalty (180 days) | CD 2098 Penalty (180 days) | Total Penalty |
|---|---|---|---|
| 4.25% APY | $54,786 | $58,768 | $113,554 |
| 5.0% APY | $64,456 | $69,138 | $133,594 |

52.     If the CDs have long maturities and are subject to 180-day interest penalties, the total early withdrawal penalties could range from approximately **$94,000 to $136,000**—essentially double the short-term penalty amounts. To put these amounts in perspective, the Diocese's total monthly payroll is approximately $127,422, which includes bi-weekly payroll for lay employees of approximately $55,000 and monthly payroll for the Bishop and diocesan priests of $17,422. The lower end of the short-term penalties ($47,000) represents approximately 37% of the Diocese's monthly payroll, while the higher end of the long-term penalties ($136,000) would exceed an entire month's total payroll for all diocesan employees. These are not theoretical or abstract costs—they represent direct losses equivalent to between one-third and more than one full month of wages for the priests, administrative staff, and other employees who serve the Diocese's mission.

53.     Additionally, the Diocese holds at least one other certificate of deposit at Southern Heritage Bank (account 0411) that would also be subject to early withdrawal penalties, further increasing the total cost beyond these calculations.

54.     These penalties would represent direct, immediate losses to the estate that provide no corresponding benefit to creditors—they are pure waste that reduces the funds available for distribution.

55.     **Loss of Secured Credit Facility.** The Diocese's loan from Southern Heritage Bank provides important liquidity and operational flexibility. Disrupting this relationship by moving the pledged CD would:

14

a. Require either immediate repayment (creating liquidity strain during critical early bankruptcy stages) or negotiating replacement financing

b. Likely result in less favorable terms, as the Diocese's bankruptcy status makes it a higher-credit-risk borrower

c. Potentially require higher interest rates or additional collateral for replacement financing

d. Consume substantial management time and legal fees during the critical early stages of the bankruptcy case

e. Potentially require Court approval under § 364 for any replacement financing, adding delay and uncertainty

f. Risk losing access to credit entirely if replacement financing cannot be obtained on acceptable terms

56. **Administrative Burden and Disruption.** The Diocese maintains approximately fourteen bank accounts across multiple institutions, many with automated payment arrangements, direct deposit relationships, and integrated accounting systems. Closing and reopening these accounts would require:

a. Updating accounting system integrations and reprogramming financial software

b. Distributing new checks and deposit slips to multiple locations (diocesan offices, schools, parishes)

c. Training staff at various locations on new systems and procedures

57. This process typically requires 30-60 days to complete. For a religious organization operating schools, providing charitable services, and maintaining numerous parishes and ministries, such disruptions could be severely damaging to operations and the reorganization effort.

58. The Diocese's finance office is small and already managing the substantial additional workload imposed by the bankruptcy filing, including Monthly Operating Reports, bank account reconciliations for bankruptcy purposes, coordination with professionals, and creditor

15

inquiries. Requiring a complete restructuring of the banking relationships would consume resources that should be focused on case administration, creditor communication, and reorganization planning.

## VII. DIVERSIFICATION AND RISK MITIGATION

59.     The Diocese's current banking structure provides significant risk mitigation through diversification across multiple institutions:

a.  Red River Bank (3 operating accounts, 1 savings account, 2 restricted fund accounts, 1 workers' compensation CD)

b.  Southern Heritage Bank (4 accounts including secured and restricted CDs)

c.  Ameriprise Financial (diversified investment account)

d.  Cadence Bank (priest benefits account)

e.  Regions Bank (checking/sweep account)

f.  Catholic Mutual and Ouachita Bank (maintained below FDIC limits per Diocese's agreement)

60.     This diversification protects against institution-specific risk. If any single bank were to experience difficulties, the majority of the Diocese's funds would remain unaffected and available for operations.

61.     Concentrating all funds at a single "authorized depository" would eliminate this diversification benefit and potentially increase overall risk exposure, particularly given the significant cost and operational disruption such concentration would create. The Diocese would be exposed to operational risk (system failures, processing errors), institution-specific risk (management issues, local economic factors), and concentration risk (all funds at risk if single institution fails).

## VIII. TOTALITY OF CIRCUMSTANCES ANALYSIS

16

62.     Courts analyzing § 345(b) waiver requests apply a "totality of circumstances" test considering multiple factors. *In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999); *In re King Mt. Tobacco Co.*, 623 B.R. 323, 333-34 (Bankr. E.D. Wash. 2020). I have evaluated each relevant factor as applied to the Diocese's situation.

63.     **Factor 1: Sophistication and Size.** While the Diocese is a medium-sized nonprofit rather than a large commercial enterprise, it maintains sophisticated financial management appropriate to its operations:

    a.  Separate restricted fund accounting in compliance with UPMIFA

    b.  Diversified banking relationships with well-capitalized institutions

    c.  Professional investment management through Ameriprise Financial

    d.  Secured lending relationship demonstrating creditworthiness and financial sophistication

    e.  Multiple specialized accounts for different operational needs (payroll, benefits, restricted funds, operating capital)

    f.  Professional financial staff managing complex compliance requirements

64.     **Factor 2: Amount of Investments.** The total funds at issue (approximately $9 million across all institutions) represent a significant amount requiring prudent management. However, when properly analyzed:

    a.  Only $714,012.73 is in actual at-risk deposits at Southern Heritage Bank (not $7.3 million), representing the net exposure on the pledged CD that cannot be FDIC insured via CDARS

    b.  The Ameriprise account ($1.5 million) is fully protected through FDIC insurance and government securities

65.     **Factor 3: Bank Ratings.** All of the Diocese's depository institutions are well-capitalized, profitable, and demonstrate strong financial metrics, and in particular:

a. **Southern Heritage Bank:** 10.39% tier 1 capital leverage ratio, 1.84% ROA, 20.5% ROE, 9.1/10 capitalization rating from Weiss, 5-Star "Superior" rating from BauerFinancial

b. **Ameriprise Bank FSB:** National bank, subsidiary of publicly traded Ameriprise Financial, Inc. (NYSE: AMP)

c. **Goldman Sachs Bank USA:** Subsidiary of Goldman Sachs Group, Inc. (NYSE: GS), one of the world's leading investment banking institutions

66.     These institutions present significantly lower risk than the general banking population, and substantially lower risk than institutions that have historically failed. The combination of strong capitalization, profitability, asset quality, and independent ratings provides substantial confidence in the safety of deposits.

67.     **Factor 4: Complexity of Case.** This is a religious organization bankruptcy involving tort claims related to clergy abuse. The case presents moderate to significant complexity with:

a. Need to maintain segregated restricted fund accounts in compliance with donor restrictions and UPMIFA

b. Requirements to comply with the 1983 Code of Canon Law for the Roman Catholic Church

c. Multiple parish and school operations requiring uninterrupted banking services

d. Secured lending relationship that provides operational flexibility

e. Donor relationships that depend on maintaining restricted fund integrity and trust

68.     **Factor 5: Safeguards in Place.** Substantial safeguards already protect the Diocese's funds:

a. Perfected security interest in the largest Southern Heritage Bank CD ($1,650,000 secured)

b. FDIC insurance on all demand deposits and the Ameriprise CDs ($964,084.35 fully insured)

18

c. Investment in government securities expressly authorized by § 345(b)(2) ($550,000)

d. Well-capitalized banking partners with strong financial metrics and independent ratings

e. Diversification across multiple institutions reducing concentration risk

f. Availability of IntraFi products for additional FDIC coverage if needed

69. **Factor 6: Ability to Reorganize if Institution Fails.** The Diocese's diversification across multiple banks means that failure of any single institution would not prevent reorganization. The Diocese maintains:

a. Operating accounts at Red River Bank sufficient for ongoing operations (including payroll and critical expenses)

b. Multiple funding sources that could be accessed if needed

c. Professional financial management capable of responding to contingencies

d. Restricted funds in separate accounts that could continue supporting designated purposes

e. Secured credit facility providing liquidity buffer

f. Investment accounts providing additional reserves

70. **Factor 7: Benefit to the Debtor.** Granting the waiver provides substantial benefits:

a. Avoids $47,000-$68,000 in early withdrawal penalties (potentially $94,000-$136,000 if longer-term CDs) that would directly reduce estate assets

b. Maintains secured credit facility providing operational flexibility and liquidity

c. Preserves segregation of restricted funds and compliance with donor restrictions and UPMIFA

d. Allows management to focus on reorganization rather than banking transitions

e. Maintains established relationships with financially strong, highly-rated institutions

19

  f. Preserves diversification benefits across multiple institutions

  g. Avoids risk of errors during account transitions that could disrupt critical payments

71. **Factor 8: Harm to the Estate.** Denying the waiver would cause significant harm:

  a. **Direct costs:** $47,000-$68,000 in early withdrawal penalties for short-term CDs (potentially $94,000-$136,000 for longer-term CDs), plus additional penalties for other CDs at Southern Heritage Bank; legal fees for negotiating new banking arrangements; potential costs to obtain replacement secured credit; accounting system reconfiguration costs

  b. **Operational disruption:** payment delays; potential payroll issues affecting employee morale and retention; vendor relationship strain; risk of missed critical payments

  c. **Donor relations:** potential conflicts with restricted fund administration; loss of donor confidence; possible legal challenges to restricted fund handling

  d. **Management distraction:** diversion of limited finance staff resources from reorganization efforts; time spent on banking transitions rather than case administration

  e. **Credit facility risk:** potential loss of secured credit facility on favorable terms; possible inability to obtain replacement credit; increased borrowing costs

72. The aggregate harm from these factors could easily exceed several hundred thousand dollars in direct and indirect costs, far exceeding any theoretical benefit from strict § 345(b) compliance.

73. **Factor 9: Reasonableness of Request.** The Diocese's request is highly reasonable:

  a. Agreeing to maintain Catholic Mutual and Ouachita Bank accounts below FDIC limits

  b. Requesting waiver only for accounts with specific protective features (secured CD, restricted funds) or practical constraints (maturity dates, pledged collateral)

  Demonstrated that Ameriprise account already fully complies with § 345(b) through FDIC insurance and government securities

  c. Shown that actual at-risk deposits are only $714,012.73 at Southern Heritage Bank (not $7.3 million), representing a 90% reduction in stated risk

d.  Identified specific, quantifiable harms from strict compliance

e.  Proposed solutions that address creditor protection against potential bank failure while preserving estate value

## IX. PROPOSED SOLUTION

74.  Based upon my analysis of the Diocese's financial position, its banking relationships, the financial strength of its depository institutions, the existing protections in place, and the substantial costs and operational risks of strict § 345(b) compliance, it is my professional opinion that the Diocese's proposed approach appropriately balances creditor protection with operational necessity:

**For Red River Bank, Cadence Bank, and Regions Bank:**
- Has executed a Uniform Depository Agreement with the U.S. Trustee
- Maintain primary operating accounts with appropriate court oversight
- Continue restricted fund accounts in segregated structure

**For Southern Heritage Bank:**
- Continue existing accounts with secured CD protection ($1,650,000 secured)
- Utilize IntraFi products if Court desires additional FDIC coverage for unrestricted accounts
- Maintain restricted fund segregation in compliance with donor restrictions and UPMIFA
- Continue existing secured loan relationship providing operational flexibility

**For Ameriprise Financial:**
- Continue existing account structure
- Maintain diversified investment approach balancing safety and return
- No changes needed; account is fully compliant with § 345(b) substantive requirements

**For Other Institutions (Catholic Mutual, Ouachita Bank):**
- Maintain balances below $250,000 FDIC limit
- Continue operations as needed for specific purposes
- Provide full FDIC protection through balance limits

75.  This approach provides comprehensive protection while avoiding the substantial costs ($47,000-$68,000 in immediate penalties for short-term CDs, potentially $94,000-$136,000

21

for longer-term CDs, plus additional penalties for other CDs, plus operational disruption costs) and risks that would harm the estate and impede reorganization.

## X. CONCLUSION

76.    Based on my analysis of the Diocese's banking relationships, the financial condition of its depository institutions, the protections currently in place, and the applicable legal standards under the totality of circumstances test, I conclude that:

    a.  <u>The actual risk to estate funds is substantially lower than the U.S. Trustee's objection suggests:</u>
- Only $714,012.73 is in actual at-risk deposits at Southern Heritage Bank (not $7.3 million), representing the net exposure on the pledged CD that cannot be FDIC insured via CDARS. While $5.64 million is currently uninsured, the remainder can be fully protected.
- Zero unprotected funds at Ameriprise (100% FDIC insured or in government securities)

    b.  <u>The Diocese's banking partners are exceptionally well-capitalized institutions:</u>
- Southern Heritage Bank: 10.39% tier 1 capital ratio, 9.1/10 capitalization rating, 5-Star rating, 1.84% ROA, 20.5% ROE
- Red River Bank: 16.95% Tier 1 capital ratio, 0.08% nonperforming assets
- Both substantially exceed regulatory "well-capitalized" thresholds
- Historical bank failure rates in Louisiana extremely low (4 failures in 25 years, with consistent pattern of acquisition by healthy banks and 60-100% recovery for uninsured depositors)

    c.  <u>Significant protections already exist:</u>
- Secured CD arrangement ($1,650,000)
- FDIC insurance ($964,084.35 at Ameriprise, plus insurance on all demand deposits)
- Government securities investments ($550,000 at Ameriprise)
- Restricted fund segregation
- Diversification across multiple strong institutions
- IntraFi products available if additional protection desired

    d.  <u>Strict compliance with § 345(b) would impose substantial quantifiable costs far outweighing any incremental benefit:</u>
- $47,000-$68,000 in immediate early withdrawal penalties for the two major CDs if short-term (90-day penalty)
- $94,000-$136,000 if the CDs have long maturities requiring 180-day penalties
- Additional penalties for other CDs at Southern Heritage Bank
- Operational disruption to critical payments including payroll

22

- Loss of secured credit facility or forced refinancing at unfavorable terms
- Administrative burden consuming limited resources needed for reorganization
- Risk of payment errors during transition
- Elimination of diversification benefits

e. The totality of circumstances strongly supports granting the requested waiver under all nine factors of the *Serv. Merch.* test; and

f. The Diocese's proposed solution appropriately addresses creditor protection concerns (Red River Bank collateralization, other accounts below FDIC limits) while preserving estate value and operational continuity.

77. **In my professional opinion, denying the waiver would harm rather than help creditors by:**

- Imposing $47,000-$68,000 in immediate, avoidable costs through early withdrawal penalties for just two CDs (potentially $94,000-$136,000 if longer-term CDs), with additional penalties for other certificates

- Disrupting operations and potentially jeopardizing the reorganization effort

- Eliminating the secured lending relationship that provides operational flexibility

- Consuming limited management resources on banking transitions rather than reorganization

- Creating concentration risk through forced consolidation at a single institution

- Providing no meaningful additional protection given the existing safeguards and the exceptional financial strength of the Diocese's banking partners (particularly Southern Heritage Bank's 10.39% capital ratio, excellent ratings, and strong profitability)

78. The existing protections—secured CD, FDIC insurance, government securities, strong bank capitalization, diversification, and the use of IntraFi products at Southern Heritage— provide creditors with substantial safeguards while preserving estate value. Strict compliance would impose quantifiable costs of at least $47,000-$68,000 (and potentially as high as $94,000-$136,000) in direct penalties alone, without corresponding benefit, contrary to the purposes of § 345(b).

23

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 8th day of December 7, 2025, at Houston, Texas.


*/s/ John D. Baumgartner*
John D. Baumgartner
Managing Director
Getzler Henrich & Associates LLC