Exhibit 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

IN RE:                                                           CASE NO. 25-31257

**DIOCESE OF ALEXANDRIA**

**DEBTOR**[1]                                                     **CHAPTER 11**

**DECLARATION OF DEACON RICHARD MITCHELL
REGARDING THE DEBTOR'S HISTORY, CHARITABLE MISSION,
AND PURPOSE IN SEEKING CHAPTER 11 RELIEF**

I, Richard Mitchell, state under penalty of perjury that the following is true and correct:

1.       I am a deacon in the Roman Catholic Church and serve as the Vice Chancellor, Director of the Diaconate, and the Director of Stewardship and Public Relations for the Diocese[2] of Alexandria (the "Diocese" or the "Debtor"), a non-profit religious corporation incorporated under the laws of the State of Louisiana.

2.       In these capacities, my duties include assisting with management of the Diocese's administrative and legal affairs; supporting the journey of individuals considering becoming deacons and overseeing diaconate formation programs; planning and evaluating fundraising efforts; and facilitating media contact and other public communications with the Diocese.

3.       Accordingly, I am generally familiar with the history of the Diocese, its mission and ministries, and its purpose and goals in the captioned matter (the "Chapter 11 Case").

---

[1] The Debtor's address is 4400 Coliseum Blvd, Alexandria, LA 71303. The last four digits of the Debtor's taxpayer identification number are 1102.

[2] As discussed later in this Declaration, the term "diocese" is a part of the legal name of the Debtor in its capacity as a civil entity organized under Louisiana state law. It is also a canonical term to describe the ecclesiastical nature of the organization. Much like the term "parish," the term carries both civil and canonical meanings that may be distinguished depending on context. The term "Diocese" is used here to refer to the Debtor as a legally incorporated entity, while the term "diocese" is employed in the canonical context, although capitalization is retained for the canonical names of individual dioceses as proper nouns (e.g., the "Diocese of Shreveport" or "Diocese of Baton Rouge").

1

4. I respectfully submit this Declaration based on my personal knowledge of the administration and operations of the Diocese; information learned from my review of relevant documents; and information provided to me by members of the Diocese's advisory team. I am authorized to submit this Declaration on behalf of the Diocese, and if called upon to testify, I could and would testify competently to the facts set forth herein.

## PART I: PRELIMINARY STATEMENT

5. To enable the Diocese to minimize the adverse effects of its reorganization in its Chapter 11 Case and to avoid immediate and irreparable harm, the Diocese requests various types of relief in its "first day" pleadings (each, a "First Day Motion"). The First Day Motions seek relief intended to allow the Diocese to effectively transition into reorganization under Chapter 11 and to minimize disruption of its operations, thereby preserving and maximizing the value of the Diocese's estate and positioning the Diocese for a successful proceeding.

6. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion serves the interests of the Diocese's estate and creditors.

7. Part II of this Declaration provides a brief overview of the Diocese's history, its mission, and its ministries. Part III describes the general financial position of the Diocese and events leading to this Chapter 11 Case, and Part IV identifies the purposes and goals of this case.

## PART II: THE HISTORY, MISSION, AND MINISTRIES OF THE DIOCESE

8. The Catholic Church maintains a long and significant history in north-central Louisiana. The Roman Catholic presence in what would become the diocese dates back to 1682.

9. While many think of the Catholic Church as a single organization, it is actually comprised of many separate civil organizations linked through ecclesiastical relationships

governed by Canon (Church) Law. Each diocese exists as both a canonical and a civil entity, and its operations navigate both Canon Law and civil law.

10. Canon Law recognizes a "diocese" as a portion of the "people of God" entrusted to a bishop. Code of Canon Law ("CIC"), c.369. A diocese is established to minister to the faithful within certain territorial limits. CIC, c.368 In other words, a "diocese" is the group of the Catholic faithful within a defined territory. As populations of the faithful wax and wane, a canonical diocese can be divided or consolidated.

11. It is important to understand that the Diocese of Alexandria, as the Debtor in this case, is a distinct legal entity separate from the fifty parish corporations, independent Catholic schools, and multiple charitable organizations that operate within its geographic boundaries. Each of these entities maintains its own corporate existence under Louisiana nonprofit law, its own Federal Employer Identification Number, and its own assets and liabilities. While the Bishop of Alexandria serves as the canonical administrator and civil law president of each parish corporation pursuant to ecclesiastical authority under CIC, c. 381 and c. 392, the Diocese does not own the assets of these separate entities, nor does it guarantee their obligations.

12. The origins of the diocese date back to 1853, when Pope Pius IX created a diocese in the oldest settlement in the Louisiana Purchase, Le Post de Natchitoches. At that time, only five priests and five churches served 20,000 Catholics who were spread throughout the northern half of Louisiana.

13. During its history, the diocese underwent both name and territorial changes. In 1910, Pope Pius X renamed the "Diocese of Natchitoches" as the "Diocese of Alexandria." In 1949, the diocese was civilly incorporated as a nonprofit corporation under the laws of the State

25-31257 - #282File-10/31/25/25nter10/31/25/26:54:27:24aiExDocumenteDeclaration 14
Deacon Richard Mitchell Pg 3 of 14

of Louisiana, and the corporation is an organization classified under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

14. In 1977, the Diocese was renamed "Alexandria-Shreveport" to recognize the growing population of northwest Louisiana. However, in 1986, the Diocese was divided, with Shreveport becoming its own diocese, and the remaining territory reverting to the name "Diocese of Alexandria."

15. Today, the canonical diocese consists of approximately 36,228 Roman Catholics. The Diocese exists for the spiritual welfare of the Roman Catholics within its territorial limits, and the Diocese's principal income relies upon the generosity of those same Roman Catholics. As recognized by The Second Vatican Council's Dogmatic Constitution on the Church, *Lumen Gentium*, the Church is the People of God. Likewise, the Diocese comprises the Roman Catholics within its territorial limits.

16. Currently, the territory of the diocese spans 11,108 square miles encompassing thirteen civil parishes in central and north-central Louisiana: Natchitoches, Winn, Caldwell, Franklin, Madison, Vernon, Rapides, Grant, LaSalle, Catahoula, Tensas, Concordia, and Avoyelles.

17. There are fifty separately-incorporated Catholic church parishes and twenty-one Catholic mission churches that are served by more than fifty priests within the territory of the Diocese who, with the assistance of deacons, celebrate daily and weekend Masses for Catholic parishioners.

18. Canon law recognizes that each diocese is divided into distinct parts or parishes. CIC, c. 379; §1. While each parish maintains separate corporate existence under Louisiana nonprofit law, all operate under the ecclesiastical authority of the Bishop of Alexandria, who

4

serves as the canonical administrator and civil law president of each parish corporation. The bishop's ecclesiastical authority provides him with the right to exercise administrative, spiritual, and financial oversight over all parishes. CIC, cc. 381, 392. Without the Bishop's approval, parishes cannot "alienate"[3] property or incur debt exceeding certain thresholds, and cannot undertake other significant transactions.

19. The mission of the Diocese is as follows:

> We, God's people, gathered with our Bishop in the Diocese of Alexandria, embody the universal mission of the Catholic Church. In developing a Christian life we are called to praise God, to proclaim and teach Jesus Christ, His life, His work, His word and in the power of the Holy Spirit we are called to serve as a sign and instrument of Christ's liberating and healing presence in the world. As Church, we in the thirteen (13) parishes of central Louisiana challenge and support persons in their efforts to live as Christians, to understand Sacred Scripture and Tradition, to share with the poor, and to participate in a faith community.

20. In furtherance of its mission, the Diocese continues to serve generations of Catholics through its parishes, schools, and charitable organizations, providing spiritual guidance, education, and social services to communities throughout its geographic area.

21. Annually, approximately 2,281 students are educated in Catholic schools within the Diocese, serving grades from pre-kindergarten through either sixth, eighth or twelfth grade, depending on the school. These schools include Sacred Heart School, St. Anthony of Padua School, St. Joseph School, St. Mary Assumption School, St. Mary's School, Holy Savior Menard Central High, Our Lady of Prompt Succor School, and St. Frances Cabrini School. While the Diocese provides varying levels of administrative and operational support, none of these schools is owned or directly operated by the Diocese. Seven of the schools are parish schools, owned and operated by their respective parish corporations. In contrast, Holy Savior Menard Central High is

---

[3] *See, e.g.,* CIC, c. 1292.

5

25-31257 - #282 File 10/31/25 Entered 10/31/25 26:54:22 Main Document Declaration of Page 5 of 14
Deacon Richard Mitchell Pg 5 of 14

separately incorporated, but receives a greater degree of administrative and operational support from the Diocese.

22. The Diocese also supports various religious education programs and ministries. These programs and ministries include Maryhill Renewal Center, which hosts a variety of spiritual programs, including all A.C.T.S. (Adoration, Community, Theology, Service) Retreats held in the Diocese, and the Steubenville South Youth Conference, which is attended annually by thousands of students from the Gulf South.

23. Crucially, the Diocesan presence reaches far beyond weekly worship services and educational institutions. The civil parishes in the Diocese include, in large proportion, economically disadvantaged populations. Considering the limited public and charitable resources otherwise available in these areas, the Diocese provides critical relief to communities that otherwise would remain unserved.

24. This critical relief includes the Manna House, a soup kitchen that provides meals to those in need for more than three decades. While the Salvation Army operates a soup kitchen in Alexandria, Louisiana, it is open only for breakfast and supper. The Manna House fills a significant void by providing daily hot lunches to all.

25. The Manna House is the enduring legacy of parishioners whose volunteer efforts began in 1990, as they sought to live according to the Gospel of Matthew 25:35: "I was hungry, and you gave me food." Now a separately incorporated non-profit organization, the Manna House continues to serve the community thirty-five years later, and it remains a testament to Catholic faith in action.

26. Likewise, St. Mary's Residential Community and Services ("St. Mary's") serves persons with developmental disabilities. St. Mary's is an Intermediate Care Facility for Individuals

6

25-31257 - #282 File 10/31/25 Entered 10/31/25 26:54:22 Main Document Declaration 10 4
Deacon Richard Mitchell Pg 6 of 14

with Intellectual Disabilities and Developmental Disabilities ("ICF/DD"), including children as young as three years old. These services are particularly critical given Louisiana's closures of, and other significant reductions in, state-operated ICF/DD facilities.

27. St. Mary's is a lasting contribution of those Catholics who, enlivened by the Gospels, sought to improve the quality of life for persons with developmental disabilities. St. Mary's was founded in Clarks, Louisiana, in 1954, and was originally staffed by a group of religious sisters from Italy.

28. For the faithful of the Diocese, St. Mary's stands as a living embodiment of the Gospels' call to serve. Presently, St. Mary's cares for more than 200 residents on a 55-acre campus and is now located in Rapides Parish. Like the Manna House, it is a separately incorporated non-profit that serves Catholics and non-Catholics alike.

29. The Diocese performs its mission of social welfare in a broad, wide-reaching fashion through contributions to and cooperation with Catholic Charities of Central Louisiana, a separately incorporated non-profit, which provides:

   a. basic needs assistance, including rent and utilities assistance, SNAP enrollment assistance, and budget classes in partnership with local finance and banking professionals;

   b. disaster relief, including family preparedness and disaster training relief so that parishioners can better help their neighbors and community in time of crisis; and

   c. mental health assistance, including counseling, support groups, and a vaping/tobacco cessation program.

In short, if there is a need, the Diocese tries to meet it.

30. Through its various ministries and in association with various Catholic charitable organizations, the Diocese serves people of all backgrounds—regardless of faith, race, ethnicity, or financial circumstances. These Catholic charities and social programs offer vital support to those

7

facing hardship, with dedicated services for impoverished, elderly, and at-risk populations, alongside efforts that strengthen families and build stronger communities. Each day, the Diocese's network of ministries, charitable works, and community programs improves the lives of numerous Louisiana residents.

## PART III: THE FINANCIAL POSITION OF THE DIOCESE

31. As noted above, approximately 36,228 Catholics reside within the Diocese, representing just under 10% of the general population. In its efforts to expand its ministry, the Diocese sees signs of hope. The Diocese welcomed ninety-four new adult members in 2024 and seventy-six new adult members in 2023, well above its recent membership increases of twenty-seven in 2022, and exceeding its pre-2020 average of sixty-five new adult members per year.

32. However, the geographic area of the Diocese is largely rural, and the percentage of residents living in poverty in each civil parish exceeds the national average. Further, the new memberships are offset by losses of members, including the passing of older members each year. The number of registered families in the Diocese fell from 11,508 in FY 2019-2020 to 10,387 in FY 2023-2024. The increasing numbers of new members, while cause for the greatest of celebrations, is not expected to substantially change the financial position of the Diocese.

33. The Diocese is a "Mission Diocese," or a diocese that is not financially able to provide basic pastoral services to Catholics without outside financial assistance. Basic pastoral services include Mass and sacraments, religious education, and ministry training for priests, deacons, religious sisters, and lay persons. The Diocese receives limited assistance in the form of grants for certain eligible activities, with amounts ranging from $125,000 to $160,000 since FY 2020-2021.

8

25-31257 - #282 File 10/31/25 Entered 10/31/25 26:54:27 Main Document Declaration Pg 8 of 14 Deacon Richard Mitchell Pg 8 of 14

34. For years, the Diocese's operating expenses exceeded its gross revenue. Preliminary figures for the fiscal year ending June 30, 2025, reflect revenue of approximately $10.17 million and expenses of approximately $14.5 million, for a net loss of approximately $4.33 million. Net losses were $112,669 in FY 2023-2024, $307,886 in FY 2022-2023, and $317,865 in FY 2021-2022.

35. However, the Diocese now faces significant financial difficulties that undermine its already-strained capacity to maintain ministries and charitable work. These financial difficulties stem from litigation and claims of decades-old clergy sexual abuse of minors.

36. The Louisiana legislature created a window during which claimants could file suit without being subject to the prescriptive period that would otherwise apply to such claims. The window was initially set to remain open until June 14, 2024. As the 2024 deadline approached, the legislature extended the window for an additional three years to June 14, 2027.

37. The Diocese is a defendant in 36 civil actions in four Louisiana state judicial districts and was dismissed without prejudice in one additional action in Orleans Parish District Court, for a total of 37 filed lawsuits. These cases allege abuse incidents spanning 1953 through 1997. The Diocese received notice of an additional 38 claims from the attorneys of individuals alleging abuse within the Diocese that remain unfiled with the Courts, for a total of 85 claims.

38. The Diocese projects that it could incur approximately $400,000 in legal expenses in each lawsuit that advances through jury trial. The majority of claims arise from alleged abuse that occurred more than forty years ago. Of the priests alleged of abuse in these cases, nearly all are deceased. Many of the witnesses or potential witnesses are likely to be deceased or of advanced age and/or ill health. Crucial records may not be available. Discovery would be necessary, and it would be arduous, but as a practical matter, meaningful discovery would be impossible.

39. To make matters worse, in 1998, the Diocese experienced a major fire at St. Joseph Catholic Center which destroyed various diocesan records, further straining the ability of the Diocese to investigate and otherwise research historic records that may be necessary to defend itself against claims of abuse.

40. Further, indications from local plaintiffs' attorneys and the experiences of other dioceses around the country suggest that there are additional persons remain to assert claims. If the number of claims increase as anticipated, then the Diocese's legal expenses alone could exceed $25,000,000. The Diocese would experience total financial collapse. Crucially, some, perhaps many, of the Survivors would not receive any compensation whatsoever from the Diocese.

41. Given its precarious financial situation, the Diocese saw no other alternative but to institute bankruptcy proceedings.

### PART IV: PURPOSE AND GOALS OF THE CHAPTER 11 FILING

42. With the United States Conference of Catholic Bishops, the Diocese shares the goals of the Church to take necessary steps to "rid the Church of the scourge of the sexual abuse of minors and to open pathways of reconciliation and healing for those who were abused." United States Conference of Catholic Bishops, *Charter for the Protection of Children and Young People* (rev. 2018) (the "Dallas Charter") (quoting the "Letter of His Holiness Pope Francis to the Presidents of the Episcopal Conferences and Superiors of Institutes of Consecrated Life and Societies of Apostolic Life Concerning the Pontifical Commission for the Protection of Minors," Feb. 2, 2015).

43. **The Diocese does not seek Chapter 11 relief to evade responsibility.** In fact, the Diocese is committed to pursuing the truth. In August 2018, then-Bishop David Talley ordered an examination of all Diocesan files dating back to the Diocese of Natchitoches in 1853. A system of

10

25-33122557-#1232-1 File 04/30/259/26 Entered 04/30/259/28654/27:27:21 Main Document Declaration
Deacon Richard Mitchell Pg 10 of 14

examination was established by which every file held by the Diocese was reviewed by three sets of examiners, including laity.

44. This review process considered 535 files of clergy – <u>representing all known files of those who had served the Diocese</u> – notwithstanding the reduction in the Diocese's geographic boundaries in 1986, when the Diocese of Alexandria-Shreveport was divided into the Diocese of Alexandria (thirteen civil parishes) and the Diocese of Shreveport (sixteen civil parishes).

45. In February 2019, the Diocese published its list of credibly-accused clergy, which it supplemented based on allegations reported thereafter. Nearly all of the alleged incidents – including those later reported – occurred in the twentieth century, with many occurring more than fifty years ago.

46. The Diocese is committed to recognizing, comforting, and compensating abuse survivors (the "Survivors") while maintaining its ability to continue to operate into the future for the spiritual needs of the faithful and the corporal works of mercy that are demanded of the Church.

47. The Diocese undertakes a number of concrete measures to assure, to the greatest extent possible, that grave sins of the past are not repeated. As part of its comprehensive response, the Diocese maintains enhanced services and programs, including specialized pastoral care for survivors, therapy services, the Safe Environment program with professional clergy vetting protocols, VIRTUS training initiatives, and the independent Victim Assistance Coordinator office (cumulatively, the "Enhanced Services").

48. For instance, the Diocese engaged Lee Kneipp, Ph.D., a clinical psychologist, to serve as the Victim Assistance Coordinator ("VAC") for the Diocese. Dr. Kneipp's primary role is to provide support to the Survivors. He may help Survivors make formal complaints, provide

11

25-33127-#1232-1 File 10/31/25 Entered 10/31/25 18:54:27 Main Document Declaration of
Deacon Richard Mitchell Pg 11 of 14

psychological services, connect them with other psychological resources, and if they wish, will arrange for them to meet with the bishop.

49. The Diocese subscribes to the goals of the Dallas Charter. Originally adopted in 2002 and last amended in 2018, the Dallas Charter actively addresses:

   a. creating a safe environment for children and young people;

   b. healing and reconciliation of survivors;

   c. ensuring prompt and effective response to allegations;

   d. cooperating with civil authorities;

   e. holding offenders accountable; and

   f. instituting a process of accountability for the future to ensure instances of allegations are dealt with swiftly and effectively, assisted by the Secretariat of Child and Youth Protection and the National Review Board (NRB).

50. The Diocese is committed to seeing that those who abuse minors are held accountable for their reprehensible acts and prevented from perpetrating further abuse. Without hesitation or qualification, the Diocese encourages and expects anyone who suspects abuse of a minor to notify civil authorities, and specifically law enforcement, <u>immediately</u>.

51. Likewise, the Diocese' Safe Environment program emphasizes proactive prevention rather than reactive response, and includes measures such as mandatory background checks, proactive screening protocols, comprehensive abuse prevention curricula implemented in schools and religious education programs, regular audits by independent third parties, and public report of compliance metrics. The Diocese, through Dr. Kneipp, also performs psychological evaluations of candidates for its diaconate and priestly formation programs.

52. In addition, the Diocese implemented the VIRTUS program, a comprehensive safe environment training program designed to prevent child sexual abuse and promote the safety of

children and vulnerable adults within religious organizations. This program is mandatory for all clergy, employees, and commissioned volunteers of the Diocese. The Diocese also adopted the VIRTUS program designed for children, which is taught in its religious education programs and Catholic school religion classes. The Diocese aims to equip children and adults to recognize and report abuse. To date, more than 8,734 people received age-appropriate training throughout the Diocese, which is not only beneficial to the Catholic Church, but also to society at large. Additionally, the Diocese instituted a "Zero Tolerance" policy. Under this policy, any clergy member that is credibly accused of sexual misconduct with a minor is removed from ministry.

53. The Enhanced Services also include a specialized pastoral care program specifically designed for Survivors, including trauma-informed counseling services at no cost, specialized training for pastoral care providers in trauma response, referral networks with secular mental health professionals, and funding for therapeutic support regardless of when abuse occurred.

54. In the months leading to its Chapter 11 Case, the Diocese informed all known legal counsel of potential claimants (collectively, the "Ad Hoc Group") and other parties in interest of its intent to reorganize. As it became essential for the Ad Hoc Group to obtain legal representation regarding bankruptcy, the Diocese agreed to satisfy, and in fact satisfied, those legal fees. The Diocese also agreed to satisfy, and in fact satisfied, all of the mediator's fees and expenses incurred for mediation between the Ad Hoc Group and the Diocese. The Diocese also agreed to satisfy financial advisory fees incurred by the Ad Hoc Group, should the group retain a financial advisor.

55. The Diocese explored means to compensate Survivors. In this endeavor, it remained transparent with the Ad Hoc Group, with whom it shared information regarding its finances and assets. The Diocese provided the Ad Hoc Group with all existing financial audit reports of the

13

25-33127-cgb Doc 129 Filed 10/31/25 Entered 10/31/25 18:54:27 Main Document Pg 13 of 14
Deacon Richard Mitchell Pg 13 of 14

Diocese from FY 2019-2020 to present. The Diocese also undertook a thorough examination of real property that it owns and procured abstracts when appropriate.

56. Further, given that nearly all of the alleged instances of abuse occurred in the mid-late twentieth century, the Diocese retained an insurance archivist to search for liability insurance policies for which the present-day Diocese holds no records. The Diocese promptly provided the Ad Hoc Group with information regarding insurance policies as they were discovered by the archivist. Upon information and belief, however, the policy periods for the insurance policies identified to-date do not encompass all dates of alleged abuse. Indeed, the Diocese already forwarded settlement demands to the insurance carriers of which it is aware, seeking financial contributions for the benefit of the Survivors in this case.

57. Against this backdrop, on October 31, 2025, the Diocese filed for Chapter 11 bankruptcy— a decision made with deep sorrow for the past and firm commitment to a just future. The Diocese took all civil and canonical steps to authorize this filing. This Chapter 11 filing seeks to create a court-supervised reorganization plan that will ensure an orderly and fair asset distribution to creditors as required by law, restore the Diocese's tenuous financial stability, and preserve its ability to maintain the religious and charitable work it provided to our Louisiana friends and neighbors for 172 years.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: October 31, 2025

                                                        */s/ Richard Mitchell*
                                                       **DEACON RICHARD MITCHELL**