# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

IN RE:                                          CASE NO. 25-31257

**DIOCESE OF ALEXANDRIA**

**DEBTOR[1]**                                    **CHAPTER 11**

---

## RESPONSE TO THE U.S. TRUSTEE'S POST-TRIAL BRIEF

NOW INTO COURT, through undersigned counsel, comes Wiener, Weiss & Madison, A Professional Corporation ("WWM"), counsel for the Official Committee of Unsecured Creditors (the "Committee") (*see* D.E. 245), which files this response ("Response") to the "U.S. Trustee's Post-Trial Brief Concerning Proposed Counsel's Cited Case Law" (D.E. 252) (the "UST Brief"), and in support of its Response states as follows:

### BACKGROUND

1.      The Debtor filed a voluntary petition for relief under chapter 11 on October 31, 2025 (the "Petition Date"). *See* D.E. 1.

2.      By order of the Court, hearings on expedited "First Day Motions" were set for November 5, 2025. *See* D.E. 30.

3.      The docket reflects that the November 5 hearing on First Day Motions occurred, and that R. Joseph Naus of WWM ("RJN") and Antony D. Constantini, Trial Attorney for the Office of the U.S. Trustee ("UST"), were present at that hearing ("Mr. Constantini"). *See* docket entries from November 5, 2025.

---

[1] The Debtor's address is 4400 Coliseum Blvd, Alexandria, LA 71303. The last four digits of the Debtor's taxpayer identification number are 1102.

25-31257 - #257  File 02/03/26  Enter 02/03/26 22:32:06  Main Document  Pg 1 of 21

4.	On November 21, 2025, the UST filed a "Notice of Appointment of Unsecured Creditors' Committee," (the "Appointment Notice"), which provided notice that certain unsecured creditors of the Debtor, who were holders of sexual abuse claims against the Debtor, were appointed to serve on the committee of unsecured creditors (the "Committee"). *See* D.E. 94.

5.	On December 23, 2025, WWM filed an *Application of the Official Committee of Unsecured Creditors to Employ Wiener, Weiss & Madison, A Professional Corporation as Counsel and Its Request for Related Relief* (the "Application"). *See* D.E. 202.

6.	In the Application, WWM specifically requested that the Court authorize the Committee to retain WWM as of October 31, 2025, the Petition Date. *See e.g.*, D.E. 202, pg. 16 (prayer for relief).

7.	WWM filed the *Notice of Hearing and Response Deadline* for the Application on December 30, 2025 (D.E. 208), to provide notice that (a) the hearing on the Application would be held on January 20, 2026 (the "Hearing"), and (b) the deadline to file an objection or response to the Application was January 13, 2026 (the "Objection Deadline").

8.	On January 7, 2026, on behalf of the Committee, WWM filed an additional document supporting the Application, the signed Declaration of Clint Allen. D.E. 218.

9.	On January 12, 2026, the UST, through Mr. Constantini, filed an Objection to the Application (the "UST Objection"). *See* D.E. 221.

10.	No other person or entity filed an Objection to the Application by the Objection Deadline.

11.	On January 19, 2026, WWM filed a Witness List and Exhibit List (D.E. 230) on behalf of the Committee in support of the Application, noting it reserved the right to call RJN as a

witness, and listing and attaching four documents already in the docket of the case as exhibits (collectively, the "Exhibits"):

    a.  The Declaration of RJN attached to the Application, (D.E. 202-1) (the "RJN Declaration");

    b.  The Declaration of Committee Chair Clint Allen, (D.E. 218) (the "Allen Declaration");

    c.  A Pre-Negotiation Letter Agreement, dated April 17, 2025 (the "Letter Agreement"), (D.E. 202-3); and

    d.  An Amendment No. 1 to the Pre-Negotiation Letter Agreement, dated April 17, 2025 (D.E. 202-4) ("the Amendment to Letter Agreement").

12.    No other party, including the UST, filed an exhibit or witness list related to the Application.

13.    At the Hearing on the Application, only two parties presented arguments, namely, the UST, through Mr. Constantini, and the Committee, through WWM.

14.    At the outset of the Hearing, the Committee's Exhibits were offered and accepted into evidence without objection.

15.    Further, RJN testified as a witness on behalf of the Committee in support of the Application, and the UST did not object to RJN testifying (the "Testimony").

16.    No exhibits were offered by the UST, and no witnesses were called by the UST.

17.    As established by the exhibits and Testimony, it was uncontested that the Committee first met on December 1, 2025, and voted to retain and employ WWM as counsel at that meeting.

18. As discussed in open court at the Hearing and as reflected by the post-hearing order, to which the UST and WWM on behalf of the Committee consented, there was no disagreement that employment of WWM as counsel for the Committee was proper, effective nunc pro tunc, as of December 1, 2025. D.E. 245 (the "Agreed Initial Retention Order").

19. The sole dispute was whether the Court could authorize the employment of WWM as counsel for the Committee effective prior to December 1, 2025, specifically back to the Petition Date, as WWM requested in the Application.

20. On that point, during the Hearing, then putative co-counsel for the Committee, WWM attorney Patrick McCune ("PLM"), relied on the following two cases:

    a. ***Fanelli v. Hensley (In re Triangle Chemicals, Inc.)***, 697 F.2d 1280 (5thCir. 1983) (the "Hensley" and the "Hensley Court"); and

    b. ***In re Motors Liquidation Company***, 438 B.R. 365 (Bankr. S.D.N.Y. 2010) (the "Motors" and the "Motors Court").

21. During the Hearing, the UST's counsel, Mr. Constantini, informed the Court that he had just received copies of Hensley and Motors from WWM attorneys just before the Hearing started, and he asked for additional time to review them and submit a post-hearing memorandum.

22. Accordingly, without objection from WWM, the Court granted the UST's request, as memorialized in a docket entry on January 20, 2026, authorizing the UST to file a brief on this topic by January 27, 2026, and authorizing WWM (along with all other interested parties) to file a reply by February 3, 2026.

23. The Agreed Initial Retention Order was entered on January 23, 2026 (D.E. 245), pursuant to which the Court approved the Committee's employment of WWM as its counsel under the terms and conditions as set forth in the Application, with such employment being effective as

4

of December 1, 2025. The Court took under advisement the question of whether the approved employment of WWM under §§ 328 and 1103 should be made effective as of the Petition Date.

24.     On the evening of January 27, 2026, the UST filed the UST Brief. (D.E. 252).

25.     That same evening, shortly after filing the UST Brief, Mr. Constantini emailed RJN and PLM, copying counsel for the Debtor, Mr. Brad Drell, and an attorney for the UST, Anna Haugen. A copy of that email is attached to this Response as **Exhibit 1**. (the "First Constantini Email").

26.     After Mr. Constantini exchanged several additional emails with Mr. Drell the evening of January 27, 2026, on January 27, 2026, and again on January 28, 2026, he emailed PLM and RJN again, and that second group of emails is attached to this Response as **Exhibit 2** (the "Final Constantini Emails"), copying the same counsel he copied on his first email as well as Mr. Richard Drew of the UST's office.

27.     Other than in this Response, neither RJN nor PLM has responded either to the First Constantini Email or the Final Constantini Emails.

### LAW AND ARGUMENT

### A. The UST Brief does not dispute the analysis by the Motors Court

28.     At the Hearing, the Court asked undersigned counsel to cite authority for approving employment of counsel for the Committee prior to the Appointment Notice on November 21, 2025, or the first meeting of the Committee on December 1, 2025.

29.     Undersigned counsel cited Motors, which, in part, relied upon Hensley and similar decisions by other federal circuit courts of appeal.

5

30. Significantly, the UST Brief does not address or dispute in any way (and therefore the UST has waived any right to contest[2]) the analysis by the Motors Court, which supports the Committee's request for employment of WWM to be effective as of the Petition Date, including:

a. Neither 11 U.S.C. § 1103 nor any other provision of Title 11 of the United States Code (the "Bankruptcy Code") limits the time at which a committee's selection of its counsel becomes effective, or the time at which the court's approval does so.[3]

b. The court's power under 11 U.S.C. § 328 to approve the "reasonable terms and conditions" of employment of a professional retained under § 1103, is very broad, and unambiguously encompasses and authorizes judicial determinations as to the effective date of the employment of any such professional, the time from which counsel's compensation may be paid.[4]

c. "Under appropriate circumstances, a bankruptcy court has the power to authorize compensation for services for the benefit of an official committee, even before its official formation, in those circumstances where such is reasonable." [5]

---

[2] *See generally **Reitz v. City of Abilene***, 2021 WL 5095378, at *3 (N.D. Tx. 2021) ("Failure to raise an objection at the appropriate time waives the objection.").

[3] *See* Motors at 371-373 ("The UST contends … that section 1103 of the Code … gives rise to a temporal wall – the time at which the UST forms the committee – before which the committee's professionals cannot under any circumstances be retained – or, as more relevant here, compensated *** I disagree with the UST's contention that the language of 1103 is in any way determinative *** The statutory language does not speak, one way or another, to the time at which a committee's selection of its counsel becomes effective, or the time at which the court's approval does so. Nor does any other section of the Code so provide *** Section 1103(a) likewise does not speak to the times for which service by a duly retained counsel is compensable, and times for which it is not") (internal quotations omitted).

[4] *See* Motors at 373-374 ("The statutory language [of § 328] is very broad, and not in any way ambiguous … the effective date of retention is one of the terms and conditions of counsel's employment … So is the time from which counsel's compensation may be paid") (internal quotations omitted).

[5] *See* Motors at 375.

6

d.   While the Motors Court found such circumstances "will be very rare," it also noted that "neither the statute nor any applicable caselaw provides that there can't be any" such circumstances[6].

e.   The court's equitable powers to grant nunc pro tunc approval of applications to employ in appropriate circumstances, as recognized by several federal circuit courts (including Hensley), also provides authority for granting employment retroactive to a date prior to the formation of the official committee. And, "with a nunc pro tunc retention date, all agree that it is permissible to compensate for services from the nunc pro tunc date on, subject to the usual reasonableness requirements."[7]

f.   Considering all the foregoing, it was appropriate and permissible to authorize the retention and employment of the subject law firm nunc pro tunc to a time five months prior to the formation of the official committee it served and permit counsel to seek compensation for its services from that time.[8]

31.   Bottom line, Motors establishes that this Court, in its discretion, has the authority to grant the relief WWM/the Committee requested and authorize employment of WWM back to the Petition Date, and the UST Brief neither addresses nor contradicts the Motors Court's discussion of the essential legal authorities on this point.

32.   While the UST Brief notes that Motors is non-binding, that does not mean it cannot be persuasive. Further, the UST cites no case law contradicting the holding of Motors.

---

[6] *See* Motors Case at 375.

[7] *See* Motors Case at 375-379, and nn. 31 and 35 (citing the Hensley Case).

[8] *See* Motors Case at 369-370 and 378-379.

**B. The UST's attempts to distinguish Motors fail.**

*B.1. The law firm at issue in Motors was not working at all times for an official committee.*

33.     The primary basis of the UST's argument that Motors has no bearing on this case is its assertion that Motors dealt with a law firm working, at all times, on behalf of an official committee, under the auspices of § 1102, 1103/ § 330. UST Brief at 1; UST Brief at pg. 4 of 8, paragraph 1 of the "Analysis" section ("the critical fact is that all work done by [the law firm] C&D, at all times, was work done for an official committee, which is not the case here").

34.     The UST's statement on this point is inaccurate.

35.     In Motors, the relevant law firm was Caplin & Drysdale Chartered ("C&D"). Motors at 367.

36.     On October 6, 2009, C&D was asked to begin work for a stand-alone "subcommittee" spun off from the official general Creditors' Committee, designed to "represent[] the interests of creditors holding asbestos-related personal injury or wrongful death claims." Motors at 369. The Motors Court explains that this "subcommittee" was wholly the idea of "counsel for the Debtors and the Creditors' Committee." Motors at 369. They proposed that "the approval of the UST and the bankruptcy court be sought for the formation of such subcommittee and for its retention of separate counsel," *i.e.*, C&D, but that did not happen. Motors at 369. Instead, "the UST became uncomfortable with the idea of there being a subcommittee of an official committee," and "engaged in prolonged discussions of the subcommittee proposal," and C&D was not part of those discussions. Motors at 369-370. By the time the UST decided five months later (in March of 2010) to create and appoint a separate, official "Asbestos Claims Committee," (which filed an application to hire C&D under §§ 1103 and 328), instead of pursing the "subcommittee"

concept, C&D had spent over $100,000.00 in time and expenses in the interim representing the experimental, non-official "subcommittee" entity. *See* Motors at 369-370.

37.     The relevant facts of Motors are that the UST was not involved in the creation of the subcommittee, the UST did not recognize the subcommittee as an official committee nor as an official sub-part of an official committee, and instead, the UST considered the subcommittee merely to be an experimental "proposal" that it ultimately rejected as improper. Motors at 369-370. Additionally, although retention of C&D as counsel for the subcommittee under relevant legal authorities was considered by Debtor's counsel and the general creditors' Committee Counsel, there is no indication the UST ever approved or considered that option as viable, and it never pursued it. *See* Motors at 369. Moreover, neither the UST nor the Motors Court recognized that C&D was at any point serving as authorized counsel for the official general creditors' Committee in Motors, as the UST in this case suggests.[9]

38.     Despite this, and most relevant for the present case, the Motors Court recognized that C&D's services in representing the unofficial "subcommittee" benefited essentially the same base constituency it eventually represented once the official Asbestos Claims Committee ("ACC") was formed. Thus, the Motors Court held that C&D's retention as counsel for the ACC in March 2010, would be granted nunc pro tunc five months prior to the UST's appointment of the ACC, to the beginning of C&D's services for the unofficial subcommittee in October 2009, over the objection of the UST.

39.     Based on the facts in this case, there is statutory authority for this Court to (a) grant WWM's employment as counsel for the Committee nunc pro tunc back to the Petition Date and (b) permit it to seek compensation for its services and expenses from that date through November

---

[9] *See* UST Brief at 6 ("In the end, the Motors court simply held that the C&D law firm could be employed from when it began work for the official [general Creditors Committee]").

30, 2025, because those services benefited the same base constituency WWM now serves as counsel for the Committee.

**B.2. Like the law firm in the Motors, the work WWM completed postpetition, but prior to the formation of and first meeting of the Committee benefited the same base constituency it serves now as counsel for the Committee.**

40.     In its UST Brief, the UST attempts to undermine the captioned point.

41.     It asserts that the interest WWM served post-petition, but before the Committee was established, cannot benefit the same constituency because the Committee represents "the interest of all general[10] unsecured creditors in aggregate, including both creditors that are not abuse claimants and abuse claimants that were not represented by [the] Unofficial Ad Hoc Committee of personal injury attorneys." UST Brief at 3.

42.     First, the evidence does not support the UST's argument.

43.     In the RJN Declaration, ¶ 17, RJN explains that the five members of the Committee are each represented by attorneys who were members of the pre-petition Ad Hoc Group, *i.e.*, counsel for abuse claimants.. *See also* Allen Declaration, *e.g.*, ¶¶ 5-7, 17.

44.     Further, when the UST cross-examined RJN during the hearing, RJN testified that, to the best of his knowledge, each member of the Committee was the holder of one or more abuse claims, not general unsecured claims, and that the unsecured claims which were the focus of the Committee were abuse claims. If the UST was concerned about commercial unsecured creditors, it should have appointed one to the Committee. *Accord* 11 U.S.C. § 1102(b)(1) ("a committee of creditors appointed under subsection (a) of this section shall ordinarily consist of the persons,

---

[10] *Cf.* 11 U.S.C. § 1102(a)(1) (noting the UST shall appoint a committee of creditors holding "unsecured claims" not as the UST states above, "general" unsecured claims); *see also* the Appointment Notice, D.E. 94 (stating "the following unsecured creditors … are among those holding unsecure claims … and therefore, are appointed as a committee of unsecured creditors;" the notice does not reference a committee of "general" unsecured creditors).

10

willing to serve, that hold the seven largest claims against the debtor *of the kinds represented on such committee* ....") (emphasis added).

45.     Second, it should be noted that the UST's own logic recognizes the plain fact that abuse claimants are unsecured creditors, and thus when WWM provided services that benefited abuse claimants, WWM was serving constituent unsecured creditors.

46.     Further, the UST points to the nature of WWM's prepetition work under the Letter Agreement and the Amendment to Letter Agreement in further support of its argument. This too is unavailing.

47.     As the Amendment to Letter Agreement states, WWM provided legal services prepetition to the attorneys who represent individuals with one or more abuse claims against the Debtor. Those services included advice about class treatment of the underlying abuse victims/ plaintiffs in the impending bankruptcy, work on a "Restructuring Support Agreement" ["RSA"] with the Diocese addressing those claims, and related matters. *See* Amendment to Letter Agreement, ¶1c. And, as the Letter Agreement states, the parties entered into it because they desired to conduct negotiations to attempt to minimize litigation costs and expenses (including in the impending bankruptcy case) and ensure an equitable resolution of the claims of the individual abuse claimants. *See* Letter Agreement, ¶ 1. As noted above, the Letter Agreement states the objective was to negotiate class treatment for abuse claims, not just treatment for the claims of certain plaintiffs. *See* Letter Agreement, ¶ 1.

48.     Thus, while the attorneys representing the abuse claimants were the pre-petition clients, WWM's work was ultimately for the benefit of the abuse claimants.

49.     After the Debtor filed bankruptcy, the Letter Agreement terminated by its own terms (*see* Letter Agreement, ¶ 9c). As the RJN Declaration states, however, attorneys from the

prepetition Ad Hoc Group requested WWM's assistance in navigating the early phases of the bankruptcy, to protect the interests of the abuse claimants. *See* RJN Declaration at ¶ 14. And, as his Testimony established, RJN felt ethically obligated to continue to assist the plaintiff attorneys in their representation of their clients, the abuse victims.

50.     The RJN Declaration explains (*see* ¶ 14) that from October 31, 2025, through November 21, 2025 (when the Committee was appointed), WWM performed substantial work on behalf of the abuse claimants and their attorneys, including:

     a.   monitoring docket filings and court proceedings;

     b.   coordinating with other counsel representing abuse claimants;

     c.   advising attorneys for abuse survivor claimants regarding the automatic stay, claims filing deadlines, and the status of the bankruptcy case;

     d.   attending the hearing on first day motions;

     e.   continuing to negotiate the terms of an RSA between Ad Hoc Group attorneys representing abuse survivor claimants and the Diocese;

     f.   communicating with the Office of the United States Trustee about the formation of a creditors' committee with representation for abuse survivor claimants; and

     g.   discussing the appointment and role of a committee with Ad Hoc Group attorneys.

51.     In the RJN Declaration (¶ 15), RJN further explained that this work was undertaken because:

     a.   The Ad Hoc Group attorneys representing the interests of the abuse survivor claimants, creditors in this case, needed experienced bankruptcy counsel during this critical period to protect the interest of the abuse victims;

b.  It was important to continue efforts to reach an agreement on a consensual plan, which would result in the reduction of overall litigation costs for the estate and the preservation of estate assets available for distribution to claimants;

c.  WWM possessed institutional knowledge about this case that would be lost if it did not continue the representation;

d.  It was important to enter into discussions immediately with the U.S. Trustee regarding a possible committee including abuse survivor claimants, and to consult with the attorneys representing abuse survivor claimants about the committee;

e.  WWM anticipated that if a creditors' committee were formed, it would likely include abuse claimants whose attorneys were members of the Ad Hoc Group that WWM had been advising; and

f.  If the Committee retained WWM, it could submit a request for compensation from the estate as an administrative expense for post-petition work.

52.  Further, the Allen Declaration explains that the Committee chair understood that even when the bankruptcy was filed and the Letter Agreement terminated, WWM continued to provide bankruptcy counsel to attorneys representing abuse claimants during the critical early days of the bankruptcy case without compensation, and that the Committee was seeking approval of WWM's employment as of the Petition Date to allow WWM to seek compensation for that work. *See* Allen Declaration, ¶¶ 7-9.

53.  In its analysis of whether retention of the subject law firm under §§ 1103 and 328 should be granted retroactive to a time postpetition but prior to the formation of the relevant official committee, the Motors Court considered whether the law firm's efforts during the contested period

13

of time benefited or served the same constituency as the constituency being served by the subsequently formed official committee. *See* Motors at 377-378. As in Motors, WWM asserts that the evidence is undisputed that its efforts postpetition, but prior to the formation of the Committee and its first meeting, satisfy this requirement. WWM's services were ultimately for the benefit of the abuse claimants, who are unsecured creditors, the same constituency it now serves as counsel the Committee. Accordingly, this Court should approve WWM's employment as Committee counsel back to the Petition Date.

### C. The UST's arguments concerning § 503(b)(3)(D) / (b)(4) are inapposite.

54.     As noted in the Application, WWM requested that the Court approve it as counsel for the Committee under relevant legal authorities, namely §§ 1103 and 328, back to the Petition Date.

55.     As the Court noted at the Hearing, the issue before the Court is retention, not compensation.

56.     The UST does not contest the plain meaning of the statutes, that if a professional is retained under §§ 1103 and 328, then they may request compensation under §§ 330, 331. And, that such payment would be entitled to administrative priority under, *e.g.*, § 503(b)(2), and therefore that § 503(b)(3)(D) / (b)(4) would not be relevant.

57.     By the UST's own admission, § 503(b)(3)(D) / (b)(4) address compensation and administrative priority of certain amounts due, not retention of professionals under §§ 1103 and 328, the issue before the Court.

58.     Whether or not WWM might seek compensation under § 503(b)(3)(D) / (b)(4) at a later date for the period preceding the creation of the Committee is not the issue before the Court.

59.     Further, § 503(b)(3)(D) / (b)(4) do not even purport to address or limit the authority recognized by Motors for a court to make retention of counsel for an official committee under §§ 1103 and 328 effective prior to the creation of or a meeting of the subject committee. Nor does the UST cite any authority to dispute the holding in Motors on this point.

60.     Accordingly, the UST's arguments on §§ 503(b)(3)(D) / (b)(4) are inapposite to the matters before the Court.

### D. The UST's arguments regarding Local Rule 2014-1(b)(2) have been waived, and the questions listed in that local rule have been addressed by the evidence at the Hearing.

61.     The Application and its supporting materials were explicit in their request for this Court to approve WWM as counsel for the Committee back to the Petition Date.

62.     An Objection Deadline was set for objections to the Application.

63.     Only the UST filed an objection by the Objection Deadline, and nothing in the UST Objection addressed any argument under Local Rule 2014-1(b)(2), specifically how WWM's request in the Application for approval of its employment as counsel for the Committee retroactive to the Petition Date, before the Committee was formed, failed to satisfy the requirements of that Local Rule.

64.     The UST also did not raise any such argument at the Hearing.

65.     The UST could have raised this argument in its UST Objection or at the Hearing, and it did not. Thus, the UST has waived this argument. *See e.g.*, ***Reitz v. City of Abilene***, 2021 WL 5095378, at *3 (N.D. Tx. 2021) (noting an objection should have been raised in response to the motions at issue, and that "[f]ailure to raise an objection at the appropriate time waives the objection.").

66.     The UST raised this argument for the first time in the UST Brief.

67.     The Court allowed post-trial briefing for the UST to evaluate and respond to Motors and Hensley, not to raise new objections that it could have raised but failed to by the Objection Deadline. Accordingly, the Court should reject the UST's arguments based on Local Rule 2014-1(b)(2).

68.     Further, WWM asserts that the questions to be addressed under Local Rule 2014-1(b)(2), as they relate to the postpetition, pre-Committee formation time period (the focus of the UST Brief on this point, *see* pg. 7) have been addressed in the Application, including the supporting documents, and the evidence at the Hearing:

> a.    <u>Why the Application "was not filed earlier" ? (LR 2014-1(b)(2)(i)).</u> At the Hearing, the Testimony established that WWM immediately engaged with the UST at the November 5 hearing on First Day Motions (five days after the Petition Date) about an official committee to represent the interest of abuse claimants. The UST informed WWM and counsel for the Debtor that it would contact them before appointing the committee. However, Mr. Naus testified that the UST did not contact him or Debtor's counsel before issuing the Appointment Notice on November 21, 2025. As the Naus Testimony established, immediately after the Committee was appointed via the Appointment Notice, the Committee members, through their respective individual counsel, reached out to WWM. A meeting was held on December 1, 2025, and the members of the Committee voted to retain WWM as its counsel. As the record of the case reflects, at a hearing on December 9, concerning final relief related to certain interim orders, RJN informed the Court of several conflicts which would delay WWM's filing its employment application,

including an upcoming legal education seminar in New Orleans. WWM ultimately filed the Application on December 23, 2025.

b. <u>Why retroactive employment is required? (LR 2014-1(b)(2)(ii))</u>. The analysis throughout this Response and the evidence at the Hearing address why "retroactive employment is required."

c. <u>How the approval of the application may prejudice any parties-in-interest ? (LR 2014-1 (b)(2)(iii))</u>. Similar to the observation by the Motors Court, retention shouldn't be considered to prejudice parties-in-interest because the work "needed to be done in any event" to benefit a recognized key constituency of the bankruptcy, and was simply delayed by the UST's deliberations on the form of the committee. *See e.g.,* Motors at 377. Alternatively, the Testimony established that WWM is owed approximately $25,000.00 for fees for work from the Petition Date through November 30, 2025. These fees and any related expenses would be subject to a request for compensation if this Court approves WWM's employment retroactive to the Petition Date.

**E. The UST's attempts to distinguish Motors ignore the similarities between Motors and this case.**

69.     As in Motors, this case presents unique facts. While there have been reports in the media on certain Diocesan bankruptcy cases, the Court certainly may take judicial notice that until recently they were not common, particularly in this jurisdiction. And, the prepetition efforts represented by the Letter Agreement and Letter Agreement Amendment to negotiate agreeable terms for class treatment of abuse claims is a distinction that adds to the unique aspects of this particular case.

17

70.     In Motors, after the subject law firm began work for the benefit of the key constituency (asbestos claimants), the UST debated for five months what form of official committee representation was appropriate for that constituency before deciding and clearing the way for the law firm, C&D, to apply for formal employment under §§ 1103, 328. Here, upon the Petition Date, WWM began working for the benefit of the abuse claimants. During the weeks between that time and the Appointment Notice (a necessary predecessor to the Application), the UST considered the ideas on committee formation presented to it just after the November 5 hearing on First Day Motions by Debtors' counsel and WWM. The UST was also interested in the potential progress of negotiations between the Diocese and the Ad Hoc Group attorneys on the RSA, which was discussed at that hearing. Like the law firm in Motors, WWM continued to perform work that benefited the relevant constituency, the abuse claimants, during the UST's deliberations and until WWM filed the Application for employment pursuant to §§ 1103, 328. Similar to Motors, once the UST appointed abuse claimants as members of the official committee, WWM filed its Application for approval as counsel for the Committee retroactive to the Petition Date, the time it started work in this case for the benefit of the relevant constituency.

### F. The Constantini Emails.

71.     Undersigned counsel do not make a habit of attaching correspondence with opposing counsel to pleadings.

72.     Here, however, they decided it was necessary to address conduct that was improper.

73.     WWM does not believe the emails are relevant to the relief WWM has requested in its Application.

74.     Unfortunately, Mr. Constantini, a representative of the UST, sent the First Constantini Email (**Exhibit 1**) to undersigned counsel. Upon further mentoring and reflection, he

realized it was a serious error in judgment, or the lack of judgment, on his part, and he sent the Final Constantini Emails (**Exhibit 2**) to undersigned counsel to apologize for his initial email.

75. The First Constantini Email alleges that counsel for WWM improperly withheld the Motors Case prior to the Hearing. WWM did not find Motors until early in the morning on January 19, 2026. However, due to the time it took for PLM to travel from Baton Rouge to Shreveport that same morning, and the negotiations that same day between then putative Committee counsel and counsel for the Diocese about the bar date motion and the proposed order, WWM counsel did not complete their review of the case and decide to use Motors until the day of the Hearing. Accordingly, RJN provided copies of Motors and Hensley to Mr. Constantini before the start of the Hearing. WWM also did not object to Mr. Constantini's request for additional time to review the case and submit post-trial briefs related to the same.

76. In the First Constantini Email, Mr. Constantini seemingly threatened RJN that if he did not acquiesce to Mr. Constantini's "suggestions" then Mr. Constantini would assert a conflict, which he did not raise in the UST's initial objection or at the Hearing, to WWM's employment.

77. If Mr. Constantini had an objection to WWM's employment, he should have raised it in the UST Objection or at the Hearing. If he still has an objection that he did not raise in his objection or at the Hearing, he should attempt to assert it now with the Court. What he should not do is keep in his pocket and keep WWM on a string. And, WWM certainly does not want to represent the Committee if the Court determines that, in fact, it has a genuine conflict that prohibits it from doing so. Keeping the alleged conflict in his pocket and holding it over WWM's head is a disservice not only to WWM, but to the abuse victims in this case who have suffered immensely.

## PRAYER FOR RELIEF

Wherefore, for the foregoing, non-exclusive reasons, WWM/the Committee pray that this Court grant their request and authorize WWM's employment as counsel for the Committee nunc pro tunc retroactive to the Petition Date, and for any and all other relief to which WWM/the Committee may be entitled, even if not prayed for herein.

Dated: <u>February 3, 2026</u>

Respectfully submitted,

By:    <u>*/s/ Patrick L. McCune*</u>

WIENER, WEISS & MADISON, A.P.C.
Patrick L. McCune (La.#31863)
pmccune@wwmlaw.com
445 Louisiana Avenue
Baton Rouge, Louisiana 70802
Tel: 225-910-8084; Fax: 225-910-8082

AND

WIENER, WEISS & MADISON, A.P.C.
R. Joseph Naus (La.#17074)
rjnaus@wwmlaw.com
330 Marshall Street, Suite 1000 (71101)
P. O. Box 21990
Shreveport, Louisiana 71120-1990
Tel: 318-226-9100
Fax: 318-424-5128

*Counsel to the Official*
*Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

On February 3, 2026, I hereby certify that a true and correct copy of the foregoing Response was served by electronic notice upon all parties receiving notice via the Court's Electronic Case Filing system, and that this Response has been submitted to Stretto, Inc., for service by U.S. mail, postage prepaid, on all other parties requiring service under the Core Service List.

/s/ *Patrick L. McCune*
Patrick L. McCune