**SO ORDERED.**

**DONE and SIGNED October 26, 2026.**

JOHN S. HODGE
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Number: 25-31257 |
| | § | |
| Diocese of Alexandria | § | Chapter 11 |
| Debtor | § | |

## Memorandum Ruling and Order Denying Approval of Second Amended Disclosure Statement

Before the Court is the Second Amended Disclosure Statement [Doc. 454] filed by the Diocese of Alexandria ("Debtor") in support of its Third Amended Plan of Reorganization [Doc. 453] (the "Plan"), together with Debtor's Motion for Entry of Order Approving the Adequacy of the Disclosure Statement and the Solicitation Procedures and for Other Relief [Doc. 324].

The Plan contains provisions that exceed the permissible scope of a Chapter 11 plan. Among other things, it restricts litigation against non-debtor entities based on whether a claim "implicates" insurance coverage, purports to assign recoveries that may belong to abuse claimants, and gives the Plan Trust authority over insurance rights and obligations that may belong independently to non-debtor insureds. The Plan also characterizes its provisions as a global settlement without establishing authority to settle claims and rights belonging to others.

These are substantive legal defects, not deficiencies that additional disclosure can cure. For the reasons set forth below, the Court concludes that the Plan, as currently drafted, is patently unconfirmable as a matter of law. Approval of the

Disclosure Statement and the relief requested in the accompanying motion will therefore be denied.

## I. Background

Debtor is a Roman Catholic entity operating across thirteen civil parishes in north-central Louisiana. Debtor filed this Chapter 11 case on October 31, 2025, in response to financial distress arising from claims alleging that individuals working for or associated with the Diocese sexually abused children and vulnerable adults.

Before the petition date, the Louisiana Legislature enacted an "open window" period that temporarily revived certain historical claims involving child sexual abuse that otherwise would have been barred by liberative prescription. Debtor subsequently became a defendant in 37 civil lawsuits and received formal notice of 38 additional potential claims, primarily involving alleged incidents between 1953 and 1997. Debtor contends that the cost of defending this litigation, which it estimates could exceed $25 million, would result in its financial collapse.

The Plan is a liquidation-value plan that proposes to establish a trust for the benefit of three classes of claims: Class 4A, consisting of 158 filed "Putative Abuse Survivor Claims"; Class 4B, consisting of 33 filed "Abuse Related Contribution Claims"; and Class 4C, consisting of Trade Claims.

The trust would be funded principally through (1) a Settlement Payment initially defined as $500,000, subject to an increase necessary to satisfy the Plan's liquidation-value provision, and (2) an assignment of Debtor's rights and interests in certain historical insurance policies (the "Subject Policies"), rather than a transfer of the policies themselves. The Settlement Payment may be satisfied with cash, real property credited at fair market value, or a combination of the two.

The Plan Trustee would administer the trust, resolve claims, and pursue insurance-related recoveries. Abuse claims covered by a particular policy would share in the proceeds attributable to that policy. Claimants whose claims are not covered by insurance would receive a pro rata share of the net funds remaining in the trust after payment of administrative costs and professional fees. Alternatively, abuse claimants may elect treatment under Class 3, the "Convenience" class, and receive an expedited payment equal to 75% of their claims, capped at $5,000, in exchange for waiving rights to future insurance litigation proceeds.

The Plan discharges claims against Debtor but generally purports to preserve claims against non-debtor entities, subject to significant restrictions. Sections 9.03 and 9.07 condition the treatment of certain claims against non-debtors on whether the claimant's lawsuit "implicates" the Subject Policies. For litigation within that scope, the Plan requires a claimant to execute a "Post-Effective Date Litigation

Agreement" with the Plan Trustee. The Plan also gives Debtor certain consent rights concerning those agreements and purports to assign to the Trust recoveries obtained through the prosecution of abuse claims.

The Plan contemplates substantial post-confirmation litigation, including disputes concerning: (1) the scope and assignability of Debtor's rights under the Subject Policies; (2) the policies' status as executory contracts and the effect of their treatment under the Plan; (3) coverage and liability defenses; defense costs, premiums, deductibles, self-insured retentions, and fronting obligations; (4) potential bad-faith claims against insurers; and (5) the effect of Louisiana's direct-action statute. These anticipated disputes provide context for the Court's consideration of the Plan's restrictions on third-party claims, assignment of insurance interests, and purported global settlement.

## II. Analysis

To determine whether the Plan is patently unconfirmable, the Court must examine the Plan's restrictions on claims against non-debtors, its assignment of insurance-related rights and recoveries, and its purported global settlement.

### A. The Court May Deny Approval of a Disclosure Statement When the Proposed Plan Is Patently Unconfirmable

Section 1125(a)(1) of the Bankruptcy Code requires a disclosure statement to contain adequate information, as far as is reasonably practicable under the circumstances, to enable a hypothetical investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan.

The determination of what constitutes adequate information is subjective, depends on the circumstances of each case, and rests largely within the bankruptcy court's discretion. *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988). Although disclosure adequacy is ordinarily the principal inquiry at this stage, a bankruptcy court need not approve a disclosure statement when the plan it supports is patently unconfirmable on its face. *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) (recognizing that "a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed"). A plan is patently unconfirmable when it is clear under the law that there is no set of facts under which the plan as proposed may be confirmed.

Accordingly, the Court considers whether the Plan contains facial legal defects that make it patently unconfirmable, rather than whether additional disclosure would enable creditors to make an informed judgment about the proposed treatment.

## B. The Plan Impermissibly Restricts Third-Party Claims and Purports to Assign Recoveries Belonging to Others

### 1. The Plan's Restrictions on Litigation Against Non-Debtors Exceed the Permissible Scope of a Chapter 11 Plan

The provisions of § 9.03 (Discharge Injunction) and § 9.07 (Channeling Injunction) purport to preserve certain "direct, non-derivative claims" against non-debtor entities but limit that preservation when the claims "implicate" coverage under the Subject Policies. For litigation within that scope, § 5.06 (Rights and Responsibilities of the Plan Trustee) establishes a process under which the Plan Trustee may authorize or refuse to authorize certain litigation involving Debtor and/or an applicable insurer when the litigation implicates the Subject Policies. Before granting authorization, the Plan Trustee must consult with Debtor, make a good-faith determination regarding insurance coverage, and require the claimant to execute a Post-Effective Date Litigation Agreement on terms satisfactory to the Trustee. If the agreement requires Debtor to act, the Plan also requires Debtor's consent to the agreement's form, which may not be unreasonably withheld.

Debtor argues that these restrictions are necessary to protect the Subject Policies and their proceeds. The Subject Policies name Debtor and the Former Alexandria Parishes as insureds. Debtor contends that the policies and the proceeds potentially available to satisfy claims against any of the insureds are property of the estate, and that litigation against a non-debtor co-insured may deplete a finite pool of proceeds otherwise available to satisfy claims against Debtor.

Debtor further argues that the automatic stay prohibits actions against non-debtors to obtain or exercise control over the Subject Policies, which Debtor contends are property of the estate, and that the Plan's discharge and channeling injunctions are necessary to protect the policies and their proceeds. More broadly, Debtor maintains that the Plan must protect estate property from a "rogue plaintiff" who might sue a non-debtor and exhaust the Subject Policies outside the Plan Trust's administration. Debtor relies on decisions recognizing that, in some circumstances, litigation against a non-debtor whose liability may be covered by insurance shared with a debtor may be restrained to protect the debtor's interests.

Debtor's argument is not without force. The Fifth Circuit has recognized that an insurance *policy* may be property of the estate and that the debtor's rights against an insurer become property of the estate. *In re Edgeworth*, 993 F.2d 51, 55–56 (5th Cir. 1993). Whether liability-insurance *proceeds* are themselves property of the estate, however, depends on the debtor's interest in those proceeds, including whether the debtor has a right to receive and retain them. *Id.* ("The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the

insurer paid on a claim."); *Sosebee v. Steadfast Insurance Co.*, 701 F.3d 1012, 1023–24 (5th Cir. 2012) ("We have held that while insurance policies are generally property of the estate, the proceeds of liability insurance policies, unlike first party policies, generally are not.").

The Fifth Circuit has recognized a limited exception under which liability-insurance proceeds may constitute property of the estate when competing mass-tort claims threaten to exhaust finite proceeds needed to satisfy claims against the debtor. *Martinez v. OGA Charters, L.L.C. (In re OGA Charters, L.L.C.)*, 901 F.3d 599, 603–05 (5th Cir. 2018) ("In the 'limited circumstances' . . . where a siege of tort claimants threaten[s] the debtor's estate over and above the policy limits, we classify the proceeds as property of the estate."); *see also Roe v. Catholic Charities Archdiocese of New Orleans*, No. CV 20-1829, 2020 WL 6042327, at *3 (E.D. La. Oct. 13, 2020) (recognizing that liability-insurance proceeds may constitute estate property when policy limits are insufficient to cover multiple competing tort claims).

Courts have also recognized that, in limited circumstances, litigation against non-debtor co-insureds may be restrained to protect insurance interests or proceeds potentially available to the debtor. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001–02 (4th Cir. 1986) (addressing injunctive relief against actions "against officers or employees of the debtor who may be entitled to indemnification under [an insurance] policy or who qualify as additional insureds under the policy"); *In re Circle K Corp.*, 121 B.R. 257, 259–61 (Bankr. D. Ariz. 1990) (citing *A.H. Robins* in staying actions against non-debtor co-insureds).

For purposes of this ruling, the Court assumes, without deciding, that proceeds of the Subject Policies—including proceeds potentially available to satisfy claims against non-debtor insureds—constitute property of the estate. Even on that assumption, the Plan's restrictions are too broad. The critical distinction is between protecting estate property and restricting litigation against a non-debtor merely because the litigation may affect, or potentially lead to a claim against, insurance proceeds that are property of the estate. A lawsuit against a non-debtor ordinarily seeks to establish that entity's liability; it does not necessarily seek to obtain possession of or exercise control over the policy or its proceeds.

The analysis in *In re Roman Catholic Diocese of Rockville Centre, New York*, 651 B.R. 622, 640–45 (Bankr. S.D.N.Y. 2023), is instructive. There, the court considered whether lawsuits against non-debtor parishes that were co-insureds under policies also covering the debtor violated the automatic stay. The court accepted that shared insurance proceeds could constitute estate property because payments to non-debtor insureds could reduce proceeds available to the debtor. Nevertheless, it concluded that a lawsuit against a non-debtor co-insured did not, merely by virtue of that status and its potential effect on the proceeds, constitute an act to obtain possession of or exercise control over estate property in violation of §

362(a)(3). The lawsuit sought a judgment against the non-debtor, and the judgment might be satisfied from the non-debtor's own assets rather than the shared proceeds. If a plaintiff later sought to obtain or exercise control over estate property, that circumstance could be addressed at that time. *Id.* at 644–45.

Although *Rockville Centre* addressed the automatic stay rather than confirmation of a Chapter 11 plan, its reasoning is pertinent here. The assumed status of the Subject Policies or their proceeds as estate property does not, by itself, establish that every lawsuit that might affect those policies or proceeds must be prohibited or subjected to the Plan's restrictions.

The breadth of the Plan's term "implicates" creates the problem. The term is not limited to litigation against Debtor, litigation seeking recovery from Debtor, or litigation seeking to obtain or exercise control over property of the estate. For example, a claim against a non-debtor parish based on its own alleged misconduct may "implicate" a Subject Policy because the parish might seek coverage under the policy and might be entitled to share in insurance proceeds potentially available to satisfy claims against Debtor. Such a claim could therefore threaten to deplete proceeds otherwise available to Debtor. Yet the plaintiff may seek to satisfy any judgment from the non-debtor parish's own assets. Nevertheless, §§ 9.03 and 9.07 subject that lawsuit to the Plan's discharge and channeling injunctions and the Trustee's litigation-authorization process.

The Plan must be read as a whole, including the requirements imposed by §§ 5.06, 9.03, and 9.07. Those provisions condition the prosecution of certain claims against non-debtors on Trustee authorization and a litigation agreement that, where it requires action by Debtor, can be executed only with Debtor's consent. They thus place the ability to proceed with litigation in the hands of parties whose interests may not be aligned with the claimant's, even when the lawsuit seeks to establish the non-debtor's independent liability and the resulting judgment may be satisfied without recourse to estate property.

This result cannot be justified merely by characterizing the restrictions as a means of protecting insurance proceeds. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), holds that the Bankruptcy Code does not authorize a Chapter 11 plan to release and enjoin claims against non-debtors without the consent of affected claimants where the relief effectively discharges those claims.

The Plan conditions the prosecution of certain third-party claims on Trustee authorization and, in some circumstances, Debtor's consent. It imposes those conditions without establishing that the claims seek estate property or identifying another sufficient legal basis for restricting their prosecution. To the extent those restrictions prevent or materially impair the prosecution of independent claims against non-debtors, they exceed the permissible scope of the Plan. The Plan cannot

be confirmed with those restrictions in place.

### 2. The Plan Cannot Compel the Assignment of Recoveries Belonging to Abuse Claimants

Section 5.06 provides that "[a]ny recovery (including payment of a judgment or unpaid judgment) from the prosecution of a Putative Abuse Survivor Claim is deemed assigned to the Plan Trust." This provision raises a distinct issue from the Plan's restrictions on litigation. It purports to assign the recovery itself, rather than merely Debtor's rights under the Subject Policies. Thus, a claimant with a Putative Abuse Survivor Claim who obtains the Trustee's permission to sue a non-Debtor parish, executes the required litigation agreement, and bears the costs and expenses of prosecuting the claim could nevertheless be required to turn over the resulting recovery to the Plan Trust for distribution to other claimants—even if the recovery comes from the non-Debtor parish's own assets and is unrelated to the Subject Policies.[1]

Section 541(a)(1) of the Bankruptcy Code brings into the estate Debtor's legal and equitable interests in property as of the commencement of the case. It does not bring into the estate property that belongs independently to another person. Although a plan may provide for the transfer or distribution of estate property, it cannot enlarge the estate by deeming a third party's property to belong to Debtor or the estate. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019) ("Whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.") (citation omitted).

The Plan's definition of "Putative Abuse Survivor Claim" excludes a separate claim against a non-debtor co-defendant based on that non-debtor's own independent liability. This exclusion limits the reach of the Plan's compulsory assignment of recoveries, but it does not establish that every recovery on a claim

---

[1] Section 5.06's compulsory assignment of recoveries applies to recoveries arising from "Putative Abuse Survivor Claims," as defined in § 1.01(119). That definition provides a limited carve-out for certain claims against non-Debtors:

> "[T]o the extent a claimant asserts a separate claim against a non-Debtor co-defendant based on that non-Debtor's own independent liability, (a) any Claim, or that part of any Claim, that may be asserted against the Debtor, regardless of the theory of liability, is fully within this definition, and (b) such separate claim against the non-Debtor is not included within this definition."

The carve-out thus applies only to a "separate claim" against a non-Debtor who is a "co-defendant," and only insofar as that claim rests on the non-Debtor's "own independent liability." The portion of a Claim that may be asserted against Debtor remains within the definition, regardless of the theory of liability. Accordingly, the definition does not exclude all claims against non-Debtors or all recoveries from non-Debtors; it excludes only the qualifying separate claims described in the carve-out.

falling within the definition belongs to Debtor or the estate. A claim may implicate a Subject Policy without the resulting recovery itself constituting estate property. Ownership of the recovery depends on the claim and the legal rights from which it arises, not simply on whether insurance coverage may be implicated.

Debtor may transfer its own rights and interests in insurance policies and proceeds to the extent permitted by applicable law and the policy terms. But a claimant's recovery on a claim belonging to that claimant is a different matter. The Plan cannot transfer ownership of that recovery to the Trust merely by declaring it "deemed assigned."

Accordingly, § 5.06 cannot be confirmed to the extent it purports to assign to the Plan Trust a recovery that belongs to an abuse claimant rather than Debtor or the estate. Any assignment of recoveries must be limited to property and rights that Debtor owns or is otherwise legally authorized to transfer.

### C. The Plan's Insurance-Assignment Provisions Are Not Adequately Limited to Debtor's Own Interests

The Plan separately provides for the automatic assignment of the Assigned Insurance Interests to the Plan Trust. Section 6.01 (Insurance Assignment) describes the assignment as a transfer of Debtor's rights and interests in the Subject Policies, rather than an assignment of the policies themselves, and includes insurance-related claims such as claims for bad faith or breach of the duty of good faith and fair dealing. Sections 5.06 and 6.01 also give the Trustee broad authority to pursue and administer those interests. The issue is whether those provisions adequately limit the assignment and the Trustee's authority to rights and obligations that Debtor owns or is otherwise authorized to transfer or administer.

The Plan identifies the Former Alexandria Parishes as "named as co-insureds under the Subject Policies." Plan § 1.01(67); see also Disclosure Statement § 5.5(c) (describing them as named insureds). The Plan also recognizes that the parishes are separate from Debtor. Their status as co-insureds raises the possibility that they hold contractual rights under the Subject Policies independent of Debtor's rights.

As discussed in Section II.B.1, the Court assumes, without deciding, that proceeds of the Subject Policies—including proceeds potentially available to satisfy claims against non-debtor insureds—constitute property of the estate. That assumption concerns the status of the proceeds; it does not resolve the ownership of every contractual right under the policies. A policy may be property of the estate, and proceeds may be estate property under the applicable circumstances, without every independent right held by each insured becoming property of Debtor's estate.

The Fifth Circuit's decisions in *Edgeworth*, *Sosebee*, and *OGA Charters*

distinguish between the interests a debtor holds under an insurance policy and the proceeds that may be payable under it. Those decisions do not establish that every right held by every insured under a shared policy belongs to the bankruptcy estate.

Section 541(a)(1) brings into the estate Debtor's own legal and equitable interests in property. Accordingly, even if a Subject Policy or particular proceeds constitute estate property, that status does not, by itself, establish that the estate owns every independent contractual right held by the Former Alexandria Parishes. Nor does it authorize Debtor to transfer rights belonging independently to those entities.

The issue is whether the Plan's operative provisions extend beyond Debtor's own interests. "Assigned Insurance Interests" includes Debtor's rights, claims, interests, responsibilities, and obligations as a named insured, as well as claims and causes of action arising under or relating to the Subject Policies. Section 6.01 states that, after the Effective Date, neither Debtor nor the Reorganized Debtor will retain any interest in or control over the Assigned Insurance Interests or any proceeds. In addition, § 6.01 provides that the Plan Trust will be solely responsible, to the extent required by applicable law or the policies, for premiums, deductibles, self-insured retentions, and fronting obligations arising in any way out of any and all Putative Abuse Survivor Claims. Read together, these provisions raise the concern that the Plan may purport to transfer or control rights, or reallocate obligations, belonging independently to the Former Alexandria Parishes.

Section 6.03 (Plan Neutrality as to Insurance Policies) states that the Plan is not intended to affect, impair, or prejudice the rights and defenses of insurers or other insureds and that the parties' rights and obligations under the Subject Policies remain governed by the policies and applicable law. That reservation is important, but it does not resolve the scope of authority conferred on the Trustee by §§ 5.06 and 6.01. The Plan must be read as a whole. A general reservation of rights cannot supply authority to transfer or control rights belonging independently to a non-debtor insured, or to reallocate that insured's contractual obligations, if the operative provisions otherwise purport to do so.

The Court does not determine the precise rights of the Former Alexandria Parishes under each Subject Policy, nor does it decide that co-insured status necessarily prevents assignment of any of Debtor's insurance interests or establishes that the parishes own a particular share of the proceeds. Those questions depend on the policy language and applicable law. The narrower point is that Debtor may assign only interests it owns or is otherwise authorized to transfer. The Plan must adequately limit the assignment and the Trustee's authority to administer insurance-related rights and obligations to those Debtor is legally entitled to transfer or administer.

To the extent §§ 5.06 and 6.01 purport to transfer or place under the Trustee's control rights belonging independently to the Former Alexandria Parishes, or to reallocate their independent policy obligations, the provisions exceed Debtor's transferable interests. Section 6.03's general neutrality language does not cure that defect. The Plan cannot be confirmed as drafted unless its assignment and administration provisions are limited to the interests and obligations Debtor is legally entitled to transfer or administer.

**D. The Plan's Purported Global Settlement Exceeds the Scope of Section 1123(b)(3)(A)**

Section 4.01 (General Settlement of Claims and Interests) provides that, pursuant to §§ 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan and Confirmation Order will constitute an "integrated and global good faith compromise and settlement" of claims, interests, and controversies resolved under the Plan relating to the contractual, legal, and subordination rights of holders with respect to their allowed claims or distributions.

Section 1123(b)(3)(A) permits a plan to provide for the settlement or adjustment of a claim or interest belonging to Debtor or the estate. That authority does not, by itself, authorize a blanket settlement of claims and controversies beyond those properly subject to settlement by Debtor or the estate.

The Plan contemplates substantial post-confirmation litigation among abuse claimants, insurers, and other non-debtor parties. Those disputes may involve coverage, liability, insurance-related rights, and defenses belonging to parties other than Debtor. Yet § 4.01 broadly characterizes the Plan and Confirmation Order as a global settlement without identifying a basis on which Debtor may settle claims or controversies involving rights that do not belong to Debtor or the estate.

A Chapter 11 plan does not, merely by virtue of confirmation, settle every claim or controversy addressed by its terms. See *In re Red River Talc LLC*, 670 B.R. 251, 285 (Bankr. S.D. Tex. 2025) (explaining that a Chapter 11 plan is typically not itself a settlement, although it may include a settlement of a claim belonging to the estate). Debtor may settle its own claims and interests, subject to applicable law and the requirements governing approval of settlements. But § 1123(b)(3)(A) does not permit Debtor to settle claims, defenses, or rights belonging to non-debtors merely by describing the Plan as an integrated or global settlement.

Section 4.01 characterizes the Plan and Confirmation Order as an "integrated and global good faith compromise and settlement." That characterization does not enlarge Debtor's authority to settle claims or interests belonging to others. Section 1123(b)(3)(A) permits a plan to provide for the settlement or adjustment of claims and interests belonging to Debtor or the estate, but it does not independently

authorize the settlement of third-party rights. Accordingly, the Plan's settlement provisions cannot be given effect to the extent they purport to resolve claims, defenses, or rights that Debtor has no authority to settle.

## III. Conclusion

The Plan contains substantive legal defects that render it patently unconfirmable as a matter of law. These defects cannot be cured through additional disclosure. Soliciting votes on the Plan as currently drafted would therefore be futile and would needlessly expend estate resources.

For these reasons, approval of the Disclosure Statement and the relief requested in the accompanying motion must be denied.

Accordingly, **IT IS ORDERED** that:

1. Approval of Debtor's Second Amended Disclosure Statement [Doc. 454] is **DENIED without prejudice**.

2. Debtor's Motion for Entry of Order Approving the Adequacy of the Disclosure Statement and the Solicitation Procedures and for Other Relief [Doc. 324] is **DENIED without prejudice**.

###